J. E. MILLIGAN STEEL ERECTORS, INC., Plaintiff and Counterdefendant-Appellee, v. GARBE IRON WORKS, INC., *et al.,* Defendants and Counterplaintiffs and Third-Party Plaintiffs-Appellants (Ken Boitz *et al.,* Third-Party Defendants and Counterdefendants-Appellees).

Third District    No. 3—84—0639

Opinion filed November 26, 1985.

Joseph M. Cernugel, of Block, Krockey, Cernugel & Cowgill, of Joliet, for appellants.

Russell E. Burns, Charles E. Cronauer, and Richard L. Turner, Jr., all of Burns, Cronauer & Turner, of De Kalb, for J.E. Milligan Steel Erectors, Inc.

Erica Tina Helfer, of Rosenthal & Schanfield, of Chicago, for appellee Ken Boitz.

JUSTICE BARRY delivered the opinion of the court:

This case concerns a dispute primarily between a general contractor, Garbe Iron Works, Inc. (Garbe), and its subcontractor J. E. Milligan Steel Erectors, Inc. (Milligan). The subject matter of the dispute is a steel truss fabricated by Garbe according to "checked" detail drawings prepared by Kenneth Boitz, doing business as Technical Metals Service, and erected by Milligan over a plant owned by Olin Corporation (Olin). In 1978 Olin hired a company named Badger America to assist in the installation of pollution control systems for its factory near Joliet consisting of several buildings, one of which produced phosphoric acid. Badger America acted as Olin's agent and entered into an agreement around January of 1979 with Garbe for the fabrication and construction of steel structures for two projects—the "Phos Acid" and "Tripoly A & B" projects.

Garbe hired Milligan to provide labor and materials for the construction work and Boitz to provide checked detail drawings for the Phos Acid structure. Boitz' detailing contract was for fabrication only. It did not include erection drawings. Testimony at trial established that Kenneth Boitz prepared the drawings, and his partner, Philip Onagan, checked them. Boitz delivered the drawings to Ed Vedral, an employee of Garbe, and recommended that the truss be shop-assembled because of the large number of bolts required and to make sure the pieces fit together properly. Garbe paid $9,400 for the drawings.

In April of 1979, Mike Milligan, president of Milligan, and George Gebhardt, Milligan's field superintendent of erection, met with John Smith, salesman for Garbe, Don Lait from Olin, and Ivor McTavish, from Badger America, to arrange for the erection of the truss over the Phos Acid building. Because of the emission of noxious fumes from the plant operation, the factory had to be shut down on the date of erection. At this meeting, Olin agreed to shut down for the day at 5 a.m. of May 5, 1979, a Saturday.

In preparation for the erection, Milligan assembled the truss on the ground to the extent Gebhardt thought possible during the week leading up to May 5. Early in the morning of May 5, with the use of two cranes, the truss was lifted into place. Then one crane was cut loose to lift a vertical member which was to be inserted in the air at

the point of a splice along the horizontal chord. After detaching the second crane, the first of four end diagonal members was lifted (by crane) to be attached to the vertical columns. At that point Al Wheeler, Milligan's erection foreman, learned that the diagonals were all cut a foot too long. Wheeler told Gebhardt about the problem and Gebhardt testified that he immediately went to Badger America's trailer on the site to call Garbe for instructions on handling the faulty members. According to Gebhardt, Ivor McTavish was at the site all day of May 5 and was present during his attempt to telephone Garbe. McTavish, however, denied learning that there was any problem with the end diagonals until the week following May 5. In any event, Gebhardt opted to lift two of the end diagonals for the east side and hang them to the columns so that the crane could be moved off the railroad tracks. The other two end diagonals were left lying on the ground when Gebhardt took his men off the job around 6 p.m. that evening. The truss at that point was set with the exception of the end diagonals and some other work along the west side.

According to Gebhardt, John Smith, McTavish, Ron Hudson, Badger's job engineer, Mike Milligan and Gebhardt met at the site on May 7 to discuss the problem with the end diagonals. The possibilities of cutting off a foot or refabricating the pieces were discussed, but no decision was reached. Most of the balance of construction work on the project was completed by Milligan so that Badger America could place fiberglass duct work on the truss. Two 12 foot sections of the ductwork were hoisted into place on May 8, but the remaining 30 sections had to be refabricated and were not installed until three weeks later.

According to McTavish, the problem with the end diagonals was first brought to his attention during the middle of the week following May 5. At that time he visually observed a "very noticeable deflection" in the lateral top chord along the north side of the truss. On May 30, McTavish directed that no more load be placed on the truss. On June 6, McTavish directed Milligan to cut the diagonals and attach them. This was done. Garbe then hired Robert Layer, a structural engineer, to investigate the truss problem.

On June 13, 1979, Layer visited the site and determined that the bottom chord, if not the top chord, was overstressed and would continue to subside without some support. Milligan proposed to do the truss repair work. However, because of a disagreement between Garbe and Milligan as to which entity was responsible for causing the deflection, Garbe chose to hire another firm, CT Erectors, to repair the truss. The out-of-pocket costs to Garbe of the repair work was $61,800.

Garbe discontinued payments to Milligan when it estimated that

the amount it still owed on its contract and approved back charges equalled the cost of the truss repairs. Milligan, accordingly, pulled its men off the job on October 16, 1979. At that time the contract work on the Phos Acid project was considered substantially completed, but the Tri-Poly A & B project was not.

On October 23, 1979, Milligan had the cranes it had rented from Central Steel Company removed from the site. In November, at Garbe's request, representatives of Garbe and Milligan met at the site to review job tickets for back charges. Garbe made its last payment to Milligan on December 17, 1979. Finally, on January 15, 1980, Milligan served notice of a claim for lien in the amount of $95,044.43 on Garbe and Olin. The notice on its face claims a lien for "all work done pursuant to [the] contract [which] was completed on October 16, 1979."

The instant action was filed in the circuit court of Will County on April 16, 1980. The complaint contains three counts—count I for an accounting and foreclosure of a mechanic's lien against Garbe and Olin; count II for an account stated against Garbe; and count III for contract damages against Garbe. Garbe answered and counterclaimed for breach of contract damages in the amount of $90,000 against Milligan. Garbe further filed a third-party complaint and counterclaim against Ken Boitz and his partners, Philip Onagan and William Morgan, d/b/a Technical Metal Service, for indemnification of the amount owed by Garbe on Milligan's claim. Boitz answered the third-party complaint and countercomplaint, and counterclaimed against Milligan for indemnification of the amount that might be owed by Boitz on Garbe's third-party claim. Milligan then counterclaimed against Boitz, d/b/a Technical Metals Service, for negligence. After a lengthy bench trial on the merits, the court entered judgments as follows:

(1) On Milligan's complaint count I—a mechanic's lien for plaintiff Milligan and against Garbe and Olin in the amount of $64,144.43, plus statutory interest; count II—for defendant Garbe; count III—contract damages for plaintiff Milligan and against Garbe in the amount of $64,144.43;

(2) On Garbe's countercomplaint—for counterdefendant Milligan;

(3) On Garbe's third-party complaint/countercomplaint—for Garbe and against Boitz in the amount of $500;

(4) On Boitz' countercomplaint—for counterdefendants Milligan and Garbe; and

and this appeal followed. The issues presented for our review are: (1) whether Milligan's claim for a lien was perfected pursuant to the Illinois Mechanics' Liens Act (Ill. Rev. Stat. 1983, ch. 82, par. 21 *et seq.*); (2) whether statutory interest was properly awarded from October 23, 1979; (3) whether Milligan had substantially performed on its contract with Garbe; (4) whether damages were properly allocated among Milligan, Garbe and Boitz; and (5) whether the trial court's determination of the amount of Milligan's lien under count I and damages under count III is contrary to the manifest weight of the evidence.

■ Initially, we find no merit to Olin's contention that Milligan failed to perfect its lien vis-a-vis the owner because its notice of claim served January 15, 1980, was addressed to "Olin Chemical Group." Milligan's statement of claim for mechanic's lien named "Olin Matheison Chemical Group" as the owner. "Olin Corporation" was not added as a defendant until plaintiff moved to amend its complaint at trial. It appears that "Olin Corporation" is the owner's proper name. Defendants cite no authority for its argument that the amendment to correct a misnomer may not relate back to the date of notice, and that the misnomer will thereby defeat Milligan's claim for lien against the owner. The record on appeal contains a wide variety of documents wherein the owner is denoted as "Olin Chemicals Group," "Olin Corporation," and "Olin Matheison Chemical Co." Obviously all of them refer to the same entity, and Olin Corporation does not claim that it was misled by the misnomer. Nor does Olin Corporation deny that its agent was in fact served with notice of Milligan's claim on January 15, 1980. In fact Olin does not claim any prejudice to it by reason of the misnomer. On these facts, we find no arguable basis for holding that Milligan failed to perfect its claim for lien against the owner, Olin Corporation.

Defendants present a more serious argument in asserting untimely ~~~~~~~~ ~~~ ~~~~ for finding that Milligan's claim for

(5) On Milligan's countercomplaint—for counterdefendant Boitz. Garbe and Olin filed a timely post-trial motion which was denied,

at any time after making his contract with the contractor, and shall within 90 days after the completion thereof, or, if extra or additional work or material is delivered thereafter, within 90 days after the date of completion of such extra or additional work or final delivery of such extra or additional material, cause a written notice of his claim and the amount due or to become due thereunder, to be sent by registered or certified mail, with return receipt requested, and delivery limited to addressee only, to or personally served on the owner of record or his agent or architect, or the superintendent having charge of the building or improvement * * *."

■■ Where the contract or the extra or additional work is not completed, the significant date for timely notice is the last date on which work is performed for which the lien is claimed. *Daily v. Mid-America Bank & Trust Co.* (1985), 130 Ill. App. 3d 639, 474 N.E.2d 788, 790, citing *Components, Inc. v. Walter Kassuba Realty Corp.* (1978), 64 Ill. App. 3d 140, 381 N.E.2d 42.

On the face of the notice of claim served January 15, 1980, Milligan asserts that all work, for which its lien in the amount of $95,044.43 is claimed, was completed on October 16, 1979. (Clearly, January 15 was the 91st day after October 16.) Thereafter, Milligan's statement of claim for mechanic's lien dated February 14, 1980, was filed with the Will County recorder of deeds claiming completion of the job, including extras, on October 23, 1979.

Significantly, the record on appeal contains no charges by Milligan for work, materials or services after October 16. We do not believe that Milligan's participation in the removal of a rented crane on October 23 constitutes the nature of lienable services contemplated by the Act. The amount of the lien claimed by Milligan was apparently unaffected by the date on which it chose to have the crane removed. While Milligan's field superintendent was on the site during the crane's removal, it cannot be said that mere removal of equipment a week after Milligan's men had walked off the job is either labor or service contributing to the construction in question. Similarly, we reject Milligan's contention that the meeting of November 13 to review back charges is the type of work that can be tacked on to extend the period for serving a timely notice. Clearly the removal of its men on October 16 was the significant date for determining when the statutory period for Milligan's service of notice of a mechanic's lien began to run.

■ To be timely Milligan's notice of claim would have had to have been served no later than January 14, 1980. Accordingly, we hold that the trial court was manifestly erroneous in concluding that the "filing

and notice of lien herein are within the confines of the Act," and we reverse that portion of the judgment granting foreclosure on the mechanic's lien (count I of plaintiff's complaint) and interest on the amount of that lien. Having so determined, we have no occasion to decide plaintiff's second issue regarding the date as of which interest was allowed pursuant to the Mechanics' Liens Act.

Next, we consider defendant Garbe's arguments attacking the trial court's award of contract damages (count III). Garbe contends that the trial court erred in finding that Milligan had substantially performed on its contract with Garbe.

■ As Garbe correctly points out in its brief on appeal, the question of whether a party has substantially performed depends on the facts of each case. (*Joray Mason Contractors, Inc. v. Four J's Construction Corp.* (1978), 61 Ill. App. 3d 410, 378 N.E.2d 328.) The circumstances significant in determining whether a failure to perform is material include the extent to which the injured party is deprived of the benefit which he reasonably expected, the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived and the extent to which the behavior of the party failing to perform compares with standards of good faith and fair dealing. Restatement (Second) of Contracts sec. 241 (1981).

The record shows that despite Milligan's failure to attach the end diagonals, Badger installed two pieces of the fiberglass ductwork it was designed to support within three days of the May 5 truss erection, and the remaining 30 (refabricated) pieces were installed three weeks later.

It does not appear that Milligan intended to deviate from the contract when it pinned two of the end diagonals on May 5 and left the others on the ground upon discovering that they were a foot too long. While Garbe strenuously argues that the problem encountered was minor, rather than major, and according to the claims policy it should therefore have been corrected in the field by the erector, the record discloses that a genuine dispute existed between representatives of Garbe and Badger over whether the members should be simply cut to fit (in which case the error could be considered minor), or whether they had to be refabricated (wherein the error would be considered major). Ultimately, Milligan, at Garbe's direction, did cut and attach the diagonals. Then Milligan submitted a proposal to do the repair work, but Garbe, refusing to admit liability for the deflection, refused this proposal. By October 16, as for the Phos Acid project, except for repairs to correct the deflection of the truss, Milligan's work was substantially completed.

Erection work on the Tri-Poly project remained to be done when Milligan's men finally walked off, and the cost to complete the work on the contract was approximately $4,000. Evidence admitted at trial supports the conclusion that Milligan did not abandon the site until after a good faith effort had been made to resolve its differences with Garbe, and it became apparent that Garbe would not continue to pay on Milligan's invoices pursuant to their agreement. As proved at the trial, the deflection was correctable at a cost to Garbe of $61,800.

■■ In our opinion, the foregoing facts support the trial court's conclusion that Milligan's breach was not material—*ergo,* that Milligan substantially performed and is entitled to contract damages, reduced, of course, by any damages caused by negligence. Further, the contract damages to Milligan as determined by the court properly allowed for overhead and profit pursuant to contract.

Garbe challenges the trial court's allocation of responsibility for the cost of repairs among Garbe, Boitz and Milligan. Respecting this contention, we initially reject Garbe's position that it may not be found partially liable for the truss damages. If, as Garbe posits, Milligan was negligent in attempting to attach the end diagonals in the air after the truss was erected instead of on the ground, the record supports the conclusion that Garbe, nonetheless, may be found to share liability for the resulting damages caused by deflection for: (1) not "shop assembling" the members pursuant to Boitz' recommendation to Garbe's employee, Ed Vedral; (2) not having its representative available on May 5, 1979, the date the plant was closed specially to proceed with the erection; (3) not ordering prompt corrective action when the problem was brought to McTavish's attention; or (4) not taking measures to furnish temporary support for the truss before additional weight was added to the sagging truss.

■■ The foregoing evidence of record amply supports the trial court's conclusion that despite Milligan's negligent handling of the end diagonals (a matter not disputed in this appeal), Garbe must assume partial responsibility for the extent of damages caused by deflection. Its further determination that Milligan and Garbe should share liability equally is not contrary to the manifest weight of the evidence. Given Garbe's partial liability for the truss damages, we find no error in the trial court's determination to limit negligence damages to $61,800— Garbe's out-of-pocket cost of repairs as testified to in court, rather than the alternative figures proposed, which included allowances for overhead and profit to Garbe for its share of the repair bills. Accordingly, we affirm the trial court's decision on count III of plaintiff's complaint reducing Milligan's award on the contract by $30,900 for its

negligence.

Garbe next argues that the trial court's $500 award on its third-party complaint against Boitz is manifestly erroneous both at law and on the facts. Boitz, d/b/a Technical Metals, was employed by Garbe for the sole purpose of providing "checked" design detail drawings. Erection procedure details were Milligan's responsibility. In consideration for its services, Boitz was paid $9,400. Obviously, the one-foot length error on the end diagonals resulted from Boitz' negligence. The extent of Boitz' liability, however, is limited to the foreseeable injuries proximately resulting from the detailer's negligent performance.

■ Although not responsible for supervising the fabrication or erection of the steel members detailed, it is undisputed that Boitz suggested to Garbe's employee, Vedral, that the fabricator should shop-assemble the truss parts to ensure that they would fit together properly. This suggestion was not followed, and Boitz admitted that the conversation did not constitute any part of its contract with Garbe. Thus, as Garbe contends, it was foreseeable that Garbe would not shop-assemble the parts. Nonetheless, as the expert witnesses generally agreed at trial, the excess one-foot length would have been discovered before pinning any end diagonals, had Milligan not attempted to make the connections in the air only after the truss was erected. The evidence admitted at trial supports the court's conclusion that Milligan's negligence, compounded by Garbe's in not ordering prompt corrective action, was not a foreseeable consequence of Boitz' error. The undisputed cost of cutting all four defective diagonals on the ground was $500. In our opinion, the trial court correctly concluded that this amount comprised the full extent of foreseeable injuries for which the detailer Boitz is liable.

■ Lastly, we have reviewed Garbe's argument that the trial court's judgment for Milligan on count III for contract damages was manifestly erroneous. Suffice it to say, the record, primarily through testimony by, and documents introduced through, Milligan's secretary, Lillian Robinson, supports the finding that Milligan's contract damages were $95,044.43. Allowing for Milligan's negligence, the court's award of $61,144.43 is not manifestly erroneous.

For the foregoing reasons, we vacate the judgment of foreclosure of a mechanic's lien and interest against Olin Corporation and Garbe, and we affirm the judgment of the trial court in all other respects.

Affirmed in part and reversed in part.

HEIPLE, P.J., and SCOTT, J., concur.