ANTHONY R. GOLD *et al.,* Plaintiffs-Appellants, v. ZIFF COMMUNICATIONS COMPANY, d/b/a Ziff-Davis Publishing Company, Defendant-Appellee.

First District (2nd Division)    No. 1—93—3175

Opinion filed August 9, 1994.

954

Winston & Strawn, of Chicago (Dan K. Webb, Paul P. Biebel, Jr., and Julie A. Bauer, of counsel), for appellants.

Bell, Boyd & Lloyd, of Chicago (Francis J. Higgins and Kenneth E. Rechtoris, of counsel), for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court: Plaintiffs Anthony Gold (Gold), PC Brand, Inc. (PC Brand), Software Communications, Inc. (SCI), and Hanson & Connors, Inc. (Hanson) filed suit against defendant Ziff Communications Company, doing business as Ziff-Davis Publishing Company (Ziff), seeking a declaratory judgment, an injunction, and past damages arising from Ziff's alleged breach of an agreement which provided that any company controlled by Gold could advertise in Ziff's publications at reduced advertising rates. In response, Ziff filed a counterclaim alleging plaintiffs had violated the agreement and sought damages and a declaratory judgment that it had the right to terminate the agreement. Following discovery, the circuit court found that Gold did not control PC Brand within the meaning of the contract, and that lack of control constituted a material breach of the agreement which excused any further performance on the part of Ziff. The court then entered summary judgment in favor of Ziff on plaintiffs' complaint and on count I of Ziff's counterclaim, awarding Ziff $6,562,555.26 in compensatory damages.

On appeal, plaintiffs contend that (1) the circuit court erroneously entered summary judgment in favor of Ziff and against them on the issue of whether Gold controlled PC Brand within the meaning of the agreement; (2) the court improperly found as a matter of law that Gold's failure to control PC Brand constituted a material breach which excused any further performance by Ziff under the contract; (3) genuine issues of material fact remained regarding the appropriate measure of damages, if any, to be awarded; and (4) the court abused its discretion in striking their expert designation and discovery requests.

Ziff publishes, among other magazines, PC Magazine, PC Tech Journal, and PC Week. PC Magazine, a publication targeted at individuals and entities generally interested in, or in the market for, computer hardware and software products, was founded by Gold in October 1981. In November 1982, Ziff's corporate predecessor entered into various agreements with Gold whereby it obtained ownership and control from Gold of the corporation that owned PC Magazine. As consideration for the sale, Gold received a cash down payment and additional installment payments which were tied to revenues over the following five years. In a letter agreement dated November 19, 1982, which was prepared by Ziff's general counsel, J. Malcolm Morris (Morris), Gold also received the right to purchase a defined number of advertising pages in PC Magazine at an 80% discount of the advertising fee published by Ziff on its "rate cards," *i.e.*, the rates at which Ziff generally offered to sell advertising space to advertisers,

as well as the right to use PC Magazine's subscribers lists six times a year at no charge (hereinafter the Ad/List agreement). The Ad/List agreement provided that the rights were personal and could be used only by Gold or a company "owned and controlled" by him.

On September 15, 1986, Ziff and Gold entered into a letter agreement amending the Ad/List agreement. The amended Ad/List agreement provided that through December 31, 1992, Gold was permitted to purchase a limited amount of advertising space in Ziff's publications, equal to the average number of advertising pages used by each of the four largest advertisers in the preceding six issues, at a reduced rate that is 23.53% of Ziff's "then current rate card" fees. The 23.53% figure was suggested by Ziff to approximate its costs. Under the amended agreement, Gold was still entitled to use the subscribers lists six times each year.

The amended Ad/List agreement further provided that the rights afforded to Gold were personal rights and that the advertising pages and subscribers lists could be used only by him personally or "by a company which [he] control[led] (that is, in which [Gold] own[ed] at least 51% of the voting stock) and may not be assigned, transferred or allocated to any other person or entity."

The amended Ad/List agreement also provided that Ziff had the right to terminate the agreement in the event of any breach by Gold of any material provision of the agreement if the breach "continue[d] uncured for thirty days after notice of such breach to [Gold] from Ziff-Davis."

In late 1987, Gold and Stephen Dukker (Dukker) decided to take advantage of the discounted advertising and other rights available under the amended Ad/List agreement by forming a corporation which would sell IBM-compatible personal computers by mail. Dukker's lawyer, Richard Friedman, suggested that a voting trust (whereby voting rights would be separated from other rights incident to stock ownership) be used in the formation of the corporation as a means of best utilizing the rights under the amended Ad/List agreement. After the concept of a voting trust was rejected as inconsistent with the amended Ad/List agreement, Gold and Dukker exchanged several versions of a "New Business" memorandum between November 24 and December 21, 1987. Each version, however, stated that Dukker would be the chief executive officer as well as the chief operating officer of the new company, and that he would have responsibility "for all matters," subject to review by the board of directors. Each version also provided that Gold would sell his rights under the amended Ad/List agreement to the new business in consideration for an amount equal in value to the discount received

under the amended Ad/List agreement. Later versions of the memorandum provided that the new corporation would initially issue 90% of the stock to Gold and the other 10% to Dukker, but in each of the next four years, Gold would sell to Dukker, "at a nominal cost," 8% of the shares, and on the fifth year, he would transfer 9%. The fifth transfer was scheduled to occur on January 1, 1993, the day after the amended Ad/List agreement expired.

In January 1988, Gold and Dukker formed PC Brand. The certificate of incorporation authorized a single class of common stock comprising 1,000 shares. The certificate further provided that "[w]henever the corporation shall be authorized to issue only one class of stock, each outstanding share shall entitled [sic] the holder to notice of, and the right to vote at, any meeting of stockholders." It also provided that both Gold and Dukker would be directors of the corporation and would serve in that capacity until December 31, 1992. Further, any change in the number of directors could be made only by unanimous board action, and if one director died or became disabled, the surviving able director would be the sole director until January 1, 1993. Finally, the certificate stated that until December 31, 1992, it could be amended only by unanimous consent of the shareholders. The original bylaws, adopted by Gold as the sole incorporator, contained corresponding provisions.

Following incorporation, Gold held 90% of the outstanding shares of PC Brand while Dukker held the remaining 10% interest. Various interrelated agreements were entered into between Gold, Dukker, and PC Brand, including a shareholder agreement that provided that "[i]n the event of a proposed [s]ale of [PC Brand], Gold shall transfer to Dukker prior to the closing of such [s]ale, [s]tock such that Dukker's [s]tock shall equal 51% of the company." The agreement also provided that on January 1, 1989, and on January 1 of each of the three following years, Gold would transfer 8% or 80 shares to Dukker, and on January 1, 1993, Gold would transfer another 9% of the outstanding shares of the corporation. Thus, under the agreement, Dukker would possess 51% of the outstanding shares on January 1, 1993, the day after the amended Ad/List agreement expired, or sooner if PC Brand was sold.

Gold, Dukker, and PC Brand also entered into an "Assignment of Advertising Rights Agreement" in which Gold assigned his right to reduced advertising fees in Ziff's publications to the company, and an employment agreement which provided that Dukker would be PC Brand's president and chief operating officer until he acquired 51% of the outstanding shares, when he would assume the title of president and chief executive officer. In May 1988, PC Brand became

operational and commenced placing advertisements in Ziff's publications at the reduced rate under the amended Ad/List agreement. At approximately the same time, Gold formed Hanson & Connors to take further advantage of the benefits available under the amended Ad/List agreement. Hanson sold computer software by mail under the name "PC Express."

In May 1988, Ziff refused to carry Hanson's full-page ads featuring products of other manufacturers, even though it had run similar ads for SCI, Gold's company which previously conducted the same business. On July 14, 1988, Ziff asked Gold for documentation which demonstrated that he controlled the companies that sought to place ads under the amended Ad/List agreement. Gold offered an affidavit which stated that he held 90% of the outstanding shares of PC Brand and 100% of the outstanding shares of Hanson, and that the corporate records of both documents would be available for inspection upon request. Ziff sought to examine the documents, and in August or September, copies of the certificate of incorporation, the bylaws, the assignment of advertising rights agreement, the shareholder agreement, and the employment agreement between Dukker and PC Brand were provided.

After reviewing the documents, Ziff concluded that Gold possessed nominal, rather than real, ownership of 90% of PC Brand's voting stock and that Dukker was vested with actual voting control of the company. Reasoning that Gold did not really own at least 51% of the voting stock of PC Brand and that Gold's rights to reduced advertising rates under the amended Ad/List agreement were nonassignable "personal rights," Ziff concluded that PC Brand was not entitled to the reduced advertising rates. On November 8, 1988, Ziff notified Gold and PC Brand of its conclusions and its intent not to honor any further requests by PC Brand to place ads pursuant to the amended Ad/List agreement.

Thereafter, on December 6, 1988, plaintiffs filed this action against Ziff. Count I sought a declaratory judgment as to the benefits available under the amended Ad/List agreement and the definition of control. Count II sought an injunction and specific performance, and count III sought damages for breach of the agreement. Ziff filed a counterclaim against Gold and PC Brand, seeking the difference between the normal "rate card" rate and the discount rate for all advertisements placed by PC Brand.

Plaintiffs also moved for a temporary restraining order and a preliminary injunction. Following a hearing, the circuit court entered a preliminary injunction prohibiting Ziff from refusing to run PC Brand's ads in PC Magazine at the reduced rate under the amended

Ad/List agreement until a final determination of the rights of the parties was made. We affirmed the circuit court, finding that PC Brand would suffer irreparable harm unless the status quo was maintained until the merits of the case could be resolved. *Gold v. Ziff Communications Co.* (1989), 196 Ill. App. 3d 425, 553 N.E.2d 404.

Thereafter, Gold and Dukker amended PC Brand's certificate of incorporation and bylaws. Under the amendments, which became effective November 9, 1989, Gold and Dukker would no longer automatically serve as directors until December 31, 1992, but instead each had to be elected annually. The amendments also eliminated the need for unanimous shareholder action to amend the certificate of incorporation. In a letter dated November 15, 1989, Ziff informed Gold that it did not agree that the amendments resolved the concerns regarding PC Brand's use of the discounted advertising rates. The letter concluded, however, by stating that Ziff "ha[s] always been and continue[s] to be willing to grant [Gold] and the companies [he] actually own[s] and control[s] all of the rights under the [amended] Ad/List Agreement."

The following February, PC Brand moved for partial summary judgment on count I of the complaint, alleging that it was a company in which Gold owned at least 51% of the voting stock and was therefore entitled to exercise the rights provided by the amended Ad/List agreement. Ziff filed a cross-motion for summary judgment, asserting that through the interrelated agreements, Dukker, rather than Gold, was actually vested with a controlling interest of PC Brand. Ziff also contended that even if the recent amendments did provide Gold with the requisite control over PC Brand, he had already breached the agreement by assigning his personal rights under the amended Ad/List agreement to an entity that he did not control, and that such a breach excused Ziff from any further performance under the agreement.

Following a hearing on September 10, 1990, the circuit court found that Gold did control PC Brand for the period following November 1989 and granted plaintiffs' motion for summary judgment with respect to that time period and denied Ziff's motion. The court refused to rule, however, that Gold controlled PC Brand prior to that time and stated that it would hear evidence regarding Gold's control of PC Brand from January 1988 through November 1989. The court stated that it was "sorely tempted even to go further than this based on this contract" but would not because it was troubled by the "change in the corporate structure at the 11th hour" and in deference to Ziff's arguments that PC Brand's corporate structure was a "sham."

After discovery was concluded regarding whether Gold controlled PC Brand between January 1988 and November 1989, plaintiffs renewed their motion for partial summary judgment, contending that Gold's record ownership of at least 51% of the voting stock was sufficient to demonstrate that he controlled the company as a matter of law. In response, Ziff argued that the control issues presented numerous issues of material fact which "permeate[d]" the question of whether Gold controlled PC Brand, including Gold's and Dukker's subjective intent when they created the company.[1] Following a hearing on the motions on March 8, 1991, the circuit court denied plaintiffs' motion for partial summary judgment and granted summary judgment for Ziff on the control issue even though Ziff had neither moved for summary judgment on that ground nor argued that such a ruling was appropriate. The court then stated:

"In this court's opinion, the provisions of [the interrelated agreements] clearly demonstrate that Dukker, not Gold, was vested with at least fifty per cent of the ownership and control of the stock in P C Brand.

The original and amended Certificate of Incorporation expressly provides that voting shares means shares of stock which confer unlimited voting rights in the election of one or more directors.

Nevertheless, under the Certificate and the by-laws [sic], through 1992 Dukker and Gold are the only directors of the company and Dukker cannot be removed except by unanimous Board action. The directors may not be removed by the shareholders, nor may the Certificate be amended except with the unanimous consent of all shareholders.

Under the shareholder agreement, in the event of a proposed sale of P C Brand, if it occurred two weeks after P C Brand was formed, Gold had a contractual obligation to transfer to Dukker prior to such sale[,] voting stock of P C Brand such that Dukker's voting stock shall equal fifty-one per cent of P C Brand and Dukker will receive fifty-one per cent of the proceeds.

The contract also contains contractual obligations between Gold and Dukker wherein Gold is obligated to transfer portions of his ninety per cent ownership of the so-called voting stock to Dukker so that by 1993 when the benefits of the [amended] Ad/List Agreement are no longer available, Dukker will outwardly and actually own fifty-one per cent of P C Brand's voting stock.

---

[1]Ziff also filed a motion for summary judgment on the ground that Gold had never properly assigned his rights under the amended Ad/List agreement to PC Brand. The circuit court denied the motion, finding that it involved disputed questions of fact. That issue has not been raised on appeal.

Under the employment agreement Dukker shall have the duties and title of Chief Operating Officer of P C Brand with authority and responsibility over all matters in the ordinary course of [business of] P C Brand.

Dukker is President of P C Brand and cannot be removed without unanimous board action.

Paragraph 2(b) of the [employment] agreement provides Dukker with sole responsibility for determining directors' fees until the [amended] Ad/List [agreement] expires on December 31, 1992. This is important because it is well known to all of us, and this court takes judicial notice of the fact that in lieu of dividends, directors['] fees are generally paid out in small or closely held corporations.

Under the Certificate of Incorporation, if Gold dies Dukker shall be the sole director. Under the shareholders agreement[,] Dukker's rights to receive transfers of P C Brand stock while the [amended] Ad/List Agreement is in effect may not be defeated by the death of Gold.

Notwithstanding the restrictive covenants *** of the [amended] Ad/List [agreement] with Ziff, Gold manages to dispose of his personal rights under that agreement and outwardly retained record ownership of fifty-one per cent of the company's common stock and the appearance that he did so own, when in truth and fact this court finds that Gold by reason of his contracts with Dukker surrendered his fifty-one per cent ownership in substance and in fact of the fifty-one per cent of stock, and at best, Gold during the term of this agreement between Dukker and Gold owned fifty per cent of the voting stock.

Gold obviously is artful, shrewd, and in this court's opinion he has demonstrated the depths to which commercial morality has sunk in his efforts to wring the most out of this false and tantamount to fraudulent position, that merely by the ownership of fifty-one per cent of the voting stock of a corporation he can preserve this right, regardless of what he surreptitiously does in making arrangements with another, and in this court's opinion it should not be permitted.

Inasmuch as Gold fails to by reason of his agreements to hold the emoluments of ownership of fifty-one percent of the voting stock of the P C Brand Company, the court finds the issues in favor of Ziff and against Gold and the motion for summary judgment filed on behalf of Ziff is granted. The motion filed on behalf of Gold is denied."

The court further explained that rather than act "mechanically, as [it] suspect[ed] *** Gold hoped would happen," it believed that what occurred in the transaction was "readily apparent" and

therefore the underlying circumstances of the transaction were appropriate for its consideration. An order was entered on March 12, 1991, and, on March 26, 1991, the court vacated the partial summary judgment it had entered in favor of plaintiffs on September 10, 1990, thereby leaving the issue of whether Gold controlled PC Brand for the period following November 1989 to be resolved at trial.[2] The court also dissolved the preliminary injunction.

Nearly two years later, on March 2, 1993, Ziff moved for summary judgment on the remaining issues in plaintiffs' complaint and on count I on its counterclaim. Ziff asserted that Gold's failure to control PC Brand prior to November 9, 1989, constituted a material breach of the amended Ad/List agreement and therefore excused it from any further performance of its obligations under the agreement. Ziff also contended that it was entitled to receive $6,562,555.26 in damages for PC Brand's improper use of Gold's rights under the agreement. That amount represented the difference between the "rate card" rate and the discounted rate for the ads placed by PC Brand. In support of its motion, Ziff submitted an affidavit by Morris.

In response, Gold filed an affidavit stating that Ziff's calculations were flawed because they incorrectly assumed that either PC Brand or another advertiser would have paid full price for the advertising space used by PC Brand, and because Ziff incorrectly assumed that PC Brand's use of advertising pages prevented it from obtaining additional advertising since it had the ability to expand the size or increase the frequency of the publications to meet any additional advertising demands. Plaintiffs also filed a motion to reconsider the court's orders which were entered on March 12, 1991, and March 26, 1991.

Thereafter, on July 8, 1993, the circuit court denied plaintiffs' motion to reconsider, finding it untimely. The court then granted Ziff's motion for summary judgment and entered judgment on Ziff's counterclaim against Gold and PC Brand in the amount of $6,562,555.26. On August 26, 1993, the circuit court denied plaintiffs' motion to reconsider and vacate the damages award. This appeal followed.

●1 Plaintiffs first contend that the circuit court erred when it denied their motion for summary judgment on the issue of whether

---

[2]Although the circuit court included language pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) in both its March 12, 1991, and March 26, 1991, orders, we dismissed the subsequent appeal on June 12, 1991, because the circuit court had not entered a final order since its rulings had only disposed of the control issue for the period prior to November 1989.

Gold controlled PC Brand within the meaning of the amended Ad/ List agreement and entered summary judgment in favor of Ziff on that same issue. They assert that because the facts are undisputed that, at all relevant times, Gold was the owner of record of at least 51% of the voting stock of PC Brand, he "controlled" the company as a matter of law. They maintain that the circuit court improperly considered extrinsic evidence when the language of the contract was clear and unambiguous. Ziff argues in response that PC Brand's organic documents and the interrelated agreements demonstrate that Gold did not actually possess the 51% of voting stock required under the amended Ad/List agreement.

The law is well established that where the provisions of a contract are clear and unambiguous, extrinsic evidence cannot be used to show that the parties intended something else. (*Wright v. Chicago Title Insurance Co.* (1990), 196 Ill. App. 3d 920, 924, 554 N.E.2d 511; *CCG Associates I v. Riverside Associates* (1990), 157 A.D.2d 435, 440, 556 N.Y.S.2d 859, 862.)[3] An agreement which is not reasonably susceptible to more than one interpretation is considered to be unambiguous (*Lease Management Corp. v. G.I.C. Financial Services* (1990), 202 Ill. App. 3d 188, 192, 559 N.E.2d 880; *Shames v. Abel* (1988), 141 A.D.2d 531, 534, 529 N.Y.S.2d 344, 346), but a contract is not ambiguous simply because the parties disagree about its meaning. *Lease Management Corp.*, 202 Ill. App. 3d at 192; *Health-Chem Corp. v. Baker* (S.D.N.Y. 1990), 737 F. Supp. 770, 773, *aff'd* (2d Cir. 1990), 915 F.2d 805.

In the instant case, the amended Ad/List agreement provides that the rights may be used only by Gold personally or by those companies which he "controls." The agreement goes on to define control as owning "at least 51% of the voting stock." Although this is a common definition of corporate control (see *Floor v. Schaffhausen Corp.* (1964), 49 Ill. App. 2d 97, 99, 199 N.E.2d 434 ("[c]ontrol \*\*\* means the ownership of a certain minimum percentage of outstanding stock")), we cannot adopt plaintiffs' conclusion that mere record ownership was all that was required under the amended Ad/List agreement.

The amended Ad/List agreement clearly states and places primary importance on the fact that the rights under it were personal to Gold and could not be assigned to third parties unless they were businesses controlled by him. Those rights were offered as part of the original compensation package for the purchase of PC Magazine, and

---

[3]The amended Ad/List agreement provides that it is governed by New York law.

the rationale underlying this nearly absolute restriction on alienation was that Ziff was concerned that Gold might transfer his rights to the discounted advertising to parties who would otherwise pay Ziff the full advertising rate. Because we must determine the parties' intent from the contract as a whole rather than particular words or isolated phrases (*Kennedy, Ryan, Monigal & Associates, Inc. v. Watkins* (1993), 242 Ill. App. 3d 289, 295, 609 N.E.2d 925; *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Associates* (1984), 63 N.Y.2d 396, 402-03, 472 N.E.2d 315, 318), we find that the parties unambiguously intended that Gold "control" any business which sought to utilize the rights afforded him under the amended Ad/List agreement. We do not believe, however, that the language defining control as owning at least 51% of the voting stock was intended to limit subsequent inquiry to a cursory examination of the corporate records. Instead, we believe that the parties specifically chose that language because owning a majority of the voting stock is commonly understood as providing a controlling influence over the company. See 1213 W. Fletcher, Cyclopedia of Corporations § 5783 (rev. perm. ed. 1993).

Plaintiffs argue that holding a majority of stock signifies control, and they cite *Floor v. Schaffhausen* for the proposition that a contract restricting alienability to those businesses under control cannot be construed to define control in terms of involvement in the operation of business. In *Floor*, the plaintiffs entered into a contract to sell stock in a corporation to the defendant. The contract provided that the defendant could assign its rights to a corporation that it "directly or indirectly controlled." The defendant then created a wholly owned subsidiary and assigned its rights to the new corporation. The plaintiffs sued for breach of contract, alleging that the defendant did not control the new business because it was not involved in the actual operation of business. The circuit court granted the defendant summary judgment and the appellate court affirmed, finding that the contract was unambiguous and that if the parties intended such a restriction, they would have included it in the contract. *Floor*, 49 Ill. App. 2d at 99-100.

We believe that *Floor* is distinguishable from the instant case, because the plaintiff in that case, unlike Ziff, did not question the parent corporation's *ability* to control the subsidiary, but nevertheless sought to impose an unwritten contractual requirement of actual involvement in the running of the business. In contrast, rather than raising the question of whether Gold was involved in the running of PC Brand, Ziff alleges that he had stripped himself of his ability to control the corporation despite his record ownership of a majority of the outstanding stock. Because that allegation does not challenge the

parties' unambiguous intent that he control the corporation, but instead seeks to determine if it has been satisfied, the circuit court did not err when it considered the evidence and denied plaintiffs' motion for summary judgment.

●2 Plaintiffs argue in the alternative that, if extrinsic evidence is relevant to the question of whether Gold controlled PC Brand, then genuine issues of material fact remain that should have precluded the court from granting summary judgment in Ziff's favor. We agree.

Summary judgment has long been considered a drastic means of disposing of litigation and is therefore proper only when the resolution of a case depends on a question of law and no genuine issues of material fact remain. (*In re Estate of Hoover* (1993), 155 Ill. 2d 402, 410, 615 N.E.2d 736.) If a court finds that issues of fact remain, or that reasonable persons might draw different inferences from undisputed facts, summary judgment must be denied. (*Hoover*, 155 Ill. 2d at 411.) Furthermore, " '[w]here the inferences which the parties seek to have drawn deal with questions of motive, intent, or subjective feelings and reactions, summary judgment is particularly inappropriate.' " *Lynch Imports, Ltd. v. Frey* (1990), 200 Ill. App. 3d 781, 789, 558 N.E.2d 484, quoting *Schuster v. East St. Louis Jockey Club, Inc.* (1976), 37 Ill. App. 3d 483, 487, 345 N.E.2d 168.

In the instant case, the record is replete with factual questions, the most important of which is the subjective intent of Gold and Dukker when they created PC Brand and entered into the interrelated agreements. Although we understand the basis for the circuit court's conclusions, we believe that summary judgment was inappropriate in this case because numerous contradictory inferences could be made from the facts in this case. (See *Demos v. National Bank* (1991), 209 Ill. App. 3d 655, 659-60, 567 N.E.2d 1083 (stating that an appellate court need not give any deference to the circuit court's findings when reviewing a ruling on a summary judgment motion).) Accordingly, we reverse the circuit court's order granting summary judgment to Ziff and remand for a trial on the question of whether Gold violated the terms of the amended Ad/List agreement with his holdings in PC Brand.

Because we reverse the court's grant of summary judgment on the "control" issue, we also reverse the summary judgment orders on the questions of materiality and damages. (See *J.E. Milligan Steel Erectors, Inc. v. Garbe Iron Works, Inc.* (1985), 139 Ill. App. 3d 303, 310, 486 N.E.2d 945 (stating that whether a party has substantially performed is a question of fact); *Oakleaf v. Oakleaf & Associates, Inc.* (1988), 173 Ill. App. 3d 637, 647, 527 N.E.2d 926 (stating that the measure of damages for a breach of contract is a question to be

decided by the trier of fact).) By doing so, the trier of fact will be able to hear the entire matter and resolve all pertinent issues.

●3 Plaintiffs last contend that the circuit court abused its discretion in striking their expert designation and discovery request. Prior to its original summary judgment ruling in favor of Ziff in March 1991, the circuit court had set a trial date of March 11, 1991, at which only the liability issues were to be resolved, *i.e.*, whether Gold controlled PC Brand. Following that trial, the matter was to be transferred to the law division for resolution of the remaining issues. Discovery was scheduled to close on February 4, 1991, and during that time, discovery was conducted on both the liability and damages issues. On March 8, 1991, however, the circuit court entered summary judgment in favor of Ziff and a trial was never held. After the dismissal of the attempted appeal of that ruling, on February 12, 1993, plaintiffs served defendants with three discovery documents, including their fifth set of interrogatories and a designation of an expert on the damages suffered by PC Brand. Ziff's counsel advised plaintiff's counsel that the filings were untimely because discovery had already closed. Thereafter, Ziff filed a motion to strike the expert designation and discovery requests as untimely. At a hearing held on July 7, 1993, the court first granted Ziff's motions for summary judgment on the remaining counts in the complaint and on count I of the counterclaim and then granted Ziff's motion to strike.

Because it is within the discretion of the circuit court to determine whether or not a discovery request and expert designation is timely (*Wilson v. Bell Fuels, Inc.* (1991), 214 Ill. App. 3d 868, 877, 574 N.E.2d 200 (finding that no abuse of discretion occurred where the circuit court granted summary judgment and denied the plaintiffs additional time to conduct discovery where they "had over $2^1/_2$ years in which to develop their case")), we find that the circuit court did not abuse its discretion in striking plaintiffs' discovery request and expert designation where they had several years to develop their case regarding damages. Nevertheless, because we reverse the court's order granting summary judgment and remand for a trial including the damages issue, we direct the circuit court to reinstate those requests.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, reversed in part, and the cause is remanded for further proceedings.

Affirmed in part; reversed in part and remanded.

HARTMAN and SCARIANO, JJ., concur.