ANTHONY R. GOLD *et al.*, Plaintiffs and Counterdefendants-Appellees, v. ZIFF COMMUNICATIONS COMPANY, d/b/a Ziff-Davis Publishing Company, Defendant and Counterplaintiff-Appellant.

First District (2nd Division)   No. 1—99—3142

Opinion filed March 30, 2001.—Rehearing denied May 17, 2001.

34

Francis J. Higgins and Kenneth E. Rechtoris, both of Bell, Boyd & Lloyd, L.L.C., and Kevin M. Forde, both of Chicago, for appellant.

Terry M. Grimm, Neil E. Holmen, Mary Patricia Benz, and Stephen V. D'Amore, all of Winston & Strawn, of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiffs Anthony Gold (Gold), PC Brand, Inc. (PC Brand), Software Communications, Inc. (SCI), and Hanson & Connors, Inc. (Hanson), sued defendant Ziff Communications Company, doing business as Ziff-Davis Publishing Company (Ziff), for breach of contract, seeking damages arising from Ziff's alleged breach of an agreement which provided that any company controlled by Gold could advertise in Ziff's publications at reduced rates. This action was previously before this court in *Gold v. Ziff Communications Co.*, 265 Ill. App. 3d 953, 638 N.E.2d 756 (1994) (*Gold II*), which remanded for trial the "control" issue, *i.e.*, "the question of whether Gold violated the terms of the amended Ad/List agreement with his holdings in PC Brand." *Gold II*, 265 Ill. App. 3d at 965.

After a five-week trial, the jury found Ziff liable and awarded two verdicts: (1) $44,580,000 to PC Brand, Inc./Gold for future lost profits and business value damages; and (2) $10,800,000 to Hanson & Connors, Inc./SCI/Gold for future lost profits and business value damages. The trial court subsequently awarded prejudgment interest of $26,773,834.58 to PC Brand, Inc./Gold and $6,486,265.27 to Hanson & Connors, Inc./SCI/Gold.

Ziff now appeals, arguing that: (1) the trial court erred by accepting the claims of multiple plaintiffs on a single verdict form; (2) PC Brand and Hanson were not proper plaintiffs; (3) evidence failed to support the jury's verdict that Ziff breached the contract as to PC Brand and caused damages; (4) damages awarded to Gold and PC Brand were based on speculation; (5) evidence failed to support the

jury's verdict that Ziff breached the contract as to Hanson and caused damages; (6) the trial court erred by awarding prejudgment interest; and (7) certain errors occurred at trial which entitle Ziff to a new trial. Additionally, plaintiffs cross-appeal a ruling concerning the return of funds that it deposited into escrow.

## BACKGROUND

In 1981, Gold founded PC Magazine for users of personal computers. In 1982, Ziff, a publisher of specialty magazines, bought the magazine from Gold for more than $10 million. In connection with the purchase, Gold and Ziff signed a letter dated November 19, 1982, providing Gold or a company he "owned and controlled" a right to advertise at an 80% discount on a limited number of pages in PC Magazine, as well as free usage of Ziff's subscriber lists (collectively, the ad/list rights). Gold intended to use these ad/list rights as the foundation for computer mail order companies he planned to set up.

In 1983, Gold formed SCI to use the ad/list rights. SCI, wholly owned by Gold, conducted a mail order software business and advertised in PC Magazine at the 80% discount. On September 15, 1986, Gold and Ziff signed another agreement (Ad/List Agreement) which modified the 1982 agreement. Paragraph 4(i) of the Ad/List Agreement, which presented the control issue remanded for trial, stated that the ad/list rights:

"may only be used by you [Gold] personally or by a company which you control (that is, in which you own at least 51% of the voting stock) and may not be assigned, transferred or allocated to any other person or entity".

Gold was to receive the 80% ad discount and free subscribers' list usage, and those rights were expanded to other Ziff publications. Gold's ads were to be subject to the current rate card in effect for the particular publication. Rate cards contained price lists and conditions.

Paragraph 2(ii) stated that Ziff could withhold approval of list usage if it determined that the mailing could injure Ziff's business reputation and Ziff had to make its objections within seven days. Paragraph 4(ii) prohibited Gold from advertising products of existing advertisers, and paragraph 4(iii) prohibited Gold from competing with Ziff in the sale of ad space in its magazine. Paragraph 6(b) stated that a failure by Ziff to "insist upon strict adherence to any term of this agreement on any occasion shall not be considered a waiver." The Ad/List Agreement also contained a December 31, 1992, expiration date and a right to terminate upon breach of a "material provision" and failure to cure within 30 days. Explicitly, New York law governed.

To maximize the use of the ad/list rights, Gold formed two new mail order companies in late 1987 and early 1988—Hanson and PC

Brand. Gold formed Hanson to sell software by sending catalogs to names on Ziff's subscriber lists. Hanson took over SCI's business and assumed most of its assets. Gold hired Howard Gosman to operate Hanson as its president.

Gold also contacted Stephen Dukker and they negotiated a structure for a new business which became PC Brand. On January 15, 1988, Gold and Dukker signed a number of interrelated agreements drafted by their attorney, Richard Friedman. One agreement provided that Gold assigned ad/list rights to PC Brand and, in return, PC Brand was to pay Gold or SCI the cash value of the 80% discount used by PC Brand once it became profitable. Also, Gold owned 90% of PC Brand's stock while Dukker owned 10%. Gold, however, agreed to transfer shares to Dukker each year, so that Dukker would hold 51% record ownership when the Ad/List Agreement expired on December 31, 1992. Dukker was named president though December 31, 1992, and had sole responsibility for determining the amount of directors' fees, so long as he and Gold were paid equally.

PC Brand's certificate of incorporation defined voting shares as shares of stock "which confer unlimited voting rights in the election of one or more directors." PC Brand's certificate and bylaws also provided that: (1) only two directors, Dukker and Gold, would serve on the board until December 31, 1992; (2) the Dukker-Gold board composition could only be changed unanimously; (3) upon death or incapacity of either Gold or Dukker, the remaining director would become sole director; and (4) the certificate of incorporation could not be amended without unanimous consent of the stockholders.

PC Brand began operations in May 1988. Gold's capital contribution to PC Brand was about $1,000. Several internal memoranda to Ziff's in-house counsel, Malcolm Morris, indicated that full-rate advertisers learned of Gold's ad/list rights and demanded similar treatment. Plaintiffs allege that complaints by full-rate advertisers motivated Ziff to breach the Ad/List Agreement as to PC Brand and Hanson.

Three contract disputes arose between Gold and Ziff in 1988. The first dispute involved Hanson's use of the discounted space in PC Magazine to place full-page ads of other advertiser's products. On May 13, 1988, Morris declared a breach of the Ad/List Agreement based on these ads, stating that they constituted a transfer of Gold's discount to the manufacturers whose products appeared in the ads. Plaintiffs allege that the objectionable ads were nearly identical to ads Gold had run for several years through SCI without objection. In July 1988, Gold told Morris that Hanson was voluntarily refraining from placing the large ads for third-party products. At trial, Hanson claimed damages resulting from Ziff's refusal to run the large ads.

The second dispute concerned Hanson's use of Ziff's subscriber lists. The Ad/List Agreement gave Gold access to Ziff's lists six times per year. On May 10, 1989, Hanson requested the lists for a sixth mailing. On May 22, 1989, Morris wrote to Gold that Ziff would release its lists only if Hanson paid outstanding invoices and provided Ziff with other financial assurances. Plaintiffs allege that even after Hanson paid the outstanding amount, Ziff refused to release the subscriber list unless Hanson provided proof that it had working capital and inventory of goods to fill orders from the catalog mailing. Ziff, on the other hand, alleges that Hanson was insolvent and unable to pay its debts and its request for assurances was reasonable. Plaintiffs also allege that Ziff delayed in providing a subscriber list for Hanson's second catalog. Howard Gosman, president of Hanson, testified that in June 1989 Hanson ceased active business operations because Ziff erected roadblocks when Hanson attempted to utilize the ad/list rights.

The third dispute centered around the issue of whether Gold "controlled" PC Brand for purposes of utilizing the Ad/List Agreement. Ziff alleges that it first learned of PC Brand through a May 13, 1988, letter in which Gold stated he owned and controlled PC Brand. PC Brand began placing ads at the 80% discount rate in May 1988. After reviewing PC Brand's corporate records, Ziff informed Gold in a letter dated November 8, 1988, that "PC Brand is not eligible for allocation of the rights under the Ad/List Agreement" based on Ziff's conclusion that PC Brand was not controlled by Gold. The letter stated that Gold's 90% record ownership of stock was meaningless and that Dukker, as president, had greater control of the company. The letter also stated that PC Brand must pay full price for ads it had placed at the 80% discount and that if the matter was not resolved in 30 days, Ziff would have to consider other appropriate steps.

Gold testified that he contacted Morris repeatedly in the days following November 8, 1988, but Morris would not reveal what changes in PC Brand's structure would cure the perceived problem. Gold, Dukker, Morris and Ziff's senior vice president, Phil Sine, met on December 6, 1988, to discuss PC Brand. At the meeting, Sine stated that the 20% rate Gold's companies paid for advertising was too little and that Ziff wanted to double the price to 40% of the full rates.

On December 13, 1988, plaintiffs obtained a preliminary injunction requiring Ziff to continue to give PC Brand six pages of ads in each issue of PC Magazine at the 80% discount. On September 26, 1989, this court affirmed the granting of the injunction in *Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 553 N.E.2d 404 (1989) (*Gold I*). In January 1989, PC Brand requested that Gold's 80% discount also be made available in PC Week. Ziff agreed if some ad-

ditional security was provided or if 40% was paid for the additional ads, but PC Brand refused.

In November 1989, Gold and Dukker amended PC Brand's articles of incorporation to require annual election of directors. Gold testified that the amendments were designed to meet the objections in Morris' November 8, 1988, letter. Morris characterized the amendments as "cosmetic changes" which did not eliminate the problem of the basic arrangement of PC Brand.

In September 1990, the trial court granted partial summary judgment in plaintiffs' favor on the issue of whether Gold controlled PC Brand after the November 1989 corporate amendments. In October 1990, Ziff allowed PC Brand to place ads in PC Week and permitted more than six pages in PC Magazine at the 20% rate. Dukker testified that it was too late, however, because PC Brand's shortage of working capital and inability to raise capital from outside sources had already damaged the company.

In December 1990, Tandon Corporation, an international computer manufacturer, contacted PC Brand about a possible investment. On March 12, 1991, the trial court entered summary judgment in favor of Ziff on the question of Gold's control of PC Brand before the November 1989 corporate amendments. On March 21, 1991, Dukker and Gold signed a letter of intent to sell PC Brand's stock to Tandon for $4,577,045 plus payment of its debts before the injunction against Ziff was lifted. PC Brand was receiving the full ad/list benefits at this time. On March 26, 1991, the trial court vacated the September 1990 summary judgment it had entered in plaintiff's favor and dissolved the preliminary injunction which required Ziff to give PC Brand six pages of discounted ad space. By March 29, 1991, Tandon learned of the dissolution of the injunction and terminated the letter of intent. In June 1991, PC Brand was sold to Tandon for $1.5 million plus assumption of corporate debt. Ziff alleges that the $3,077,045 difference between the value in the letter of intent and final sale was solely attributable to the lost value of the ad/list rights.

On July 8, 1993, the trial court granted Ziff's motion for summary judgment regarding the "control" issue and awarded Ziff $6,562,555.26 on its counterclaim. On August 9, 1994, this court reversed and remanded for a new trial, holding that the control issue was a jury question that could not be resolved as a matter of law. The court held that "the record is replete with factual questions, the most important of which is the subjective intent of Gold and Dukker when they created PC Brand and entered into the interrelated agreements." *Gold II*, 265 Ill. App. 3d at 965. At trial, Gold testified that he initially owned 90% of PC Brand's stock while Dukker owned 10%. When PC

Brand's assets were sold in 1991, Dukker had acquired 18% of the stock while Gold owned 82%. Gold stated that at all times, he owned 51% or more of PC Brand's stock. Gold and Dukker both testified that their intent was to structure PC Brand to conform with the Ad/List Agreement.

Dukker testified that he was not completely satisfied with the interrelated agreements he had signed when PC Brand was formed for several reasons. First, he believed that Gold could fire him at will because a provision of the employment agreement stated that Dukker had to comply with the annual budget. Dukker explained that, as an experienced business person, he knew that budgets are never complied with 100%, even if there are positive sales. Second, Dukker believed that Gold had the right to liquidate PC Brand at any time and sell the assets to another company owned by Gold. Third, Dukker stated that Gold "controlled the money." Gold exercised sole power to control the flow of loans obtained from an outside firm called Microvest. Finally, Dukker stated that Gold controlled the relationship with Ziff and that Gold could change the balance of how ads were placed in favor of other entities. In sum, Dukker "clearly viewed [Gold] as [his] boss and [he] felt [he] had to kind of consign [himself] to *** the goodwill of the working relationship [they] developed. [He] wasn't thrilled with it, but [he] thought it was a fair approach."

Ziff's expert on corporate governance, David Ruder, was previously chairman of the Security and Exchange Commission and dean of Northwestern Law School. Ruder testified that Gold did not control PC Brand through majority voting stock ownership because Gold did not have the unlimited voting rights as majority shareholder to elect directors or amend the certificate or bylaws. Rather, PC Brand's board had equal voting rights vested in Dukker and Gold. According to Ruder, Gold also did not have shareholder power to establish company policy or to dissolve, merge or reorganize PC Brand. Ruder admitted that his opinion was based upon PC Brand's incorporation documents and his general understanding of the way business organizations work, and not upon the subjective intent of Gold or Dukker.

Ziff called several witnesses to testify that Ziff's conduct did not cause harm to PC Brand, including Stanley Seitz, Paul Yeh and John Kleiman. Seitz was responsible for PC Brand's day-to-day operations; Yeh prepared PC Brand's budgets and monitored actual performance to budget; and Kleiman was PC Brand's controller in 1990. Seitz, Yeh and Kleiman variously testified that PC Brand failed because of low prices and high expenses; inventory theft; and lack of access to new technology. Seitz also believed that PC Brand's financial problems were not caused by Ziff.

On the other hand, Steve Dukker testified that after October 1989, PC Brand was forced to pay for full-priced ads in non-Ziff publications and to pay Ziff 40% for ads above six pages in PC Magazine to remain competitive. Dukker stated this was not part of PC Brand's business plan and hurt the company's cash flow. Plaintiffs also allege that investors declined to invest in PC Brand because of Ziff's denial of PC Brand's right to use the ad/list benefits. Stan Seitz also testified that the money PC Brand spent on non-Ziff advertising alone exceeded the maximum amount of working capital that PC Brand required. Similarly, one of Ziff's damages experts, Alan Peterson, conceded that it would have made a difference if the money PC Brand spent on non-Ziff advertising, Ziff advertising above the 20% rate, and legal fees associated with the ad/list litigation had been available as working capital.

Plaintiffs called Mark Hosfield to testify concerning lost profits and lost business value damages. Hosfield was a partner at Arthur Andersen, an international accounting and consulting firm. He was also a certified public accountant since 1982. He worked in a group called complex claims and events, specializing in analysis of the financial and economic issues related to disputes. Based on a court ruling, Hosfield calculated lost profits for PC Brand and Hanson until December 31, 1992 (expiration of the Ad/List Agreement), and business value damages beyond that date. He was asked to assume that both companies would continue in business until December 31, 1992, and would enjoy the benefits of the Ad/List Agreement unchallenged by litigation. Hosfield calculated lost profits and business value damages to be $29,606,686 for Hanson and $45,392,491 for PC Brand.

Hosfield used the discounted cash flow (DCF) approach to value PC Brand. DCF projects a future income stream based upon the company's past performance and the growth rates of companies in the same industry. The analyst projects the cash flow of the company for some period into the future and then determines the terminal value of the business at the conclusion of the projected period. The future cash flows and terminal value are then discounted to present value, in this case December 31, 1992, by using an appropriate discount rate. Finally, the analyst adds the present values of the future cash flows and the terminal value to arrive at the business value of the company.

Hosfield first created an historical sales base from which to project profits. He used PC Brand's actual net sales for 1989 and 1990, except that he "normalized" the sales figure for the fourth quarter of 1990 to take into account the litigation effect on the company. Using the 1989 and 1990 sales figures, Hosfield then forecasted profits over several years (1993, 1994 and 1995) by projecting sales based on an expected growth rate for PC Brand.

To calculate PC Brand's expected growth rate, Hosfield selected 16 companies that were PC Brand's competitors for sales of microcomputers, including Apple, Dell, IBM, Hewlett Packard, Tandy, Texas Instruments, Data General, and Compaq. Hosfield stated that Dell was most like PC Brand because, like PC Brand, it assembled computers and sold them through the mail. Other companies (Texas Instruments, Hewlett Packard, Tandy, Data General, Compaq) competed with PC Brand by selling microcomputers, but they also sold a number of other items. Hosfield admitted that IBM was nothing like PC Brand, but was included in the growth rate calculation because it was PC Brand's competitor.

After determining individual growth rates in sales for each company, Hosfield averaged all of the growth rates except for Dell. He assigned a one-third weight to Dell and two-thirds weight to the average of the other 15 companies to calculate PC Brand's growth rate. He explained that Dell was assigned extra weight because Dell sold computers in the same manner as PC Brand. Hosfield also tested whether the growth rate calculated for PC Brand was reasonable by using PC Brand's growth rate to forecast the sales of the 16 companies. Hosfield then calculated terminal value by taking the projected earnings for 1995 and dividing them by a capitalization rate. Applying the discount rate to the cash flow projections and the terminal value, Hosfield concluded that PC Brand would have a value of $41,263,142 as of December 31, 1992. Hosfield employed the same method to conclude that Hanson would have a value of $25,769,445 as of December 31, 1992.

Adding lost profits and subtracting debt, Hosfield estimated that PC Brand was entitled to $45,392,491 damages while Hanson was entitled to recover $29,606,686. The jury awarded $44,580,000 to PC Brand, Inc./Gold for future lost profits and business value damages and $10,800,000 to Hanson & Connors, Inc./SCI/Gold for future lost profits and business value damages. The trial court subsequently awarded prejudgment interest of $26,773,834.58 to PC Brand, Inc./Gold and $6,486,265.27 to Hanson & Connors, Inc./SCI/Gold.

Ziff appeals. We affirm in part, reverse in part, and remand for a new trial limited to the issue of damages.

## ANALYSIS

### I. VERDICT FORMS

Ziff argues that the verdict forms used by the jury created a legal and logical impossibility. Specifically, the jury awarded $44,580,000 in a verdict for plaintiffs "PC Brand, Inc./Gold" and awarded $10,800,000 in a verdict for plaintiffs "Hanson & Connors, Inc./SCI/Gold." Ziff

contends that plaintiffs Gold and SCI proved no damages and should not have been included in the verdict forms.

■ "If several plaintiffs properly join, but their causes of action are separate and distinct and their damages may be different, the judgment should not be for an aggregate sum but should segregate and award to each the damages or relief to which he is properly entitled." *Caton v. Flig*, 343 Ill. App. 99, 101, 98 N.E.2d 162 (1951). Separate verdicts are appropriate only when recovery on different demands is sought. *Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068, 1077, 631 N.E.2d 1246 (1994). Additionally, the form of verdicts is a matter within the sound discretion of the trial court. *Gausselin*, 260 Ill. App. 3d at 1077.

■ Here, the plaintiffs on each verdict form were not seeking separate claims for damages based on separate and distinct transactions. In fact, Ziff admits that neither Gold nor SCI was seeking damages at all. Furthermore, the jury instructions made clear that damages were sought only as to the businesses PC Brand and Hanson. The jury was instructed:

> "PC Brand, Inc./Gold claim damages relating to the Illinois business that was operated under the name PC Brand, Inc. Hanson & Connors/Gold/SCI claim damages relating to the New York business operated by Hanson & Connors, Inc."

Thus, the inclusion of multiple plaintiffs on a single verdict form was proper because each set of plaintiffs sought a single recovery—one for harm to PC Brand, the other for harm to Hanson.

The other cases Ziff cites in support of its argument, *Eggimann v. Wise*, 41 Ill. App. 2d 471, 191 N.E.2d 425 (1963), and *In re Estate of Payton*, 79 Ill. App. 3d 732, 398 N.E.2d 977 (1979), are factually distinguishable. In *Eggimann*, verdict forms permitted a single finding based on whether the jury found defendant guilty of both negligence and wilful and wanton conduct. The court concluded that this was a "logical, and legal, impossibility." *Eggimann*, 41 Ill. App. 2d at 484. Unlike *Eggimann*, the verdict forms in the instant case did not contain two inconsistent forms of liability. *Payton* is similarly inapposite. *Payton*, 79 Ill. App. 3d at 739 (jury forms were erroneous and confusing by requiring jury to incorrectly make a blanket finding of competency or incompetency as to all of the transactions at issue). We hold that the trial court did not abuse its discretion relative to the verdict forms.

## II. PROPER PLAINTIFFS

■ Next, Ziff contends that PC Brand and Hanson were not parties to the Ad/List Agreement and lacked standing to sue for its breach. Generally, only a party to a contract or those in privy with him may sue to enforce it. *Bescor, Inc. v. Chicago Title & Trust Co.*, 113 Ill.

App. 3d 65, 69, 446 N.E.2d 1209 (1983). "In order for a third party to enforce a contract, it must be shown that there was a contractual intent to benefit the third person." *Bescor*, 113 Ill. App. 3d at 69. A third-party beneficiary may sue to enforce the terms of the contract even though the beneficiary did not exist at the time of the contract's execution. *S&B Rubber & Chemical Corp. v. Stein*, 7 N.Y.S.2d 553, 555 (1938).

In the instant case, the agreement explicitly provided that the ad/list rights could be used by Gold "personally or by a company which [Gold] control[led]." It also stated that Gold could use the rights in a "business which [Gold] set up which is engaged in mail order sales or similar distribution of products." Mail order businesses like PC Brand and Hanson were the direct and intended beneficiaries of the contract. As such, they had standing to sue under the Ad/List Agreement. *S&B Rubber*, 7 N.Y.S.2d at 555.

Ziff also argues that Gold never properly reassigned his rights under the amended ad/list agreement from SCI to PC Brand and Hanson. We agree with plaintiffs that assignments can be implied from circumstances. "[N]o particular mode or form *** is necessary to effect a valid assignment, and any acts or words are sufficient which show an intention of transferring or appropriating the owner's interest." *Adams v. Garzillo*, 279 N.Y.S. 398, 399, 155 Misc. 358, 359 (1935).

In the instant case, it is undisputed that Gold owned 100% of SCI. In a letter dated May 13, 1988, Gold, as president of SCI, instructed Ziff that he was allocating the ad/list rights to Hanson and PC Brand. See *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir. 1979) (assignment could be manifested by conduct and, in part, exists where assignor instructs his obligor to pay the specific fund owing to him to the assignee). Additionally, SCI stopped using the ad/list rights when PC Brand and Hanson were formed. Dukker and Gosman both testified that Gold told them PC Brand and Hanson could use the ad/list rights. Gold's behavior toward his companies and his conduct toward the obligor, Ziff, implied that the ad/list rights were assigned to PC Brand and Hanson.

### III. PC BRAND: BREACH AND CAUSATION

### A. BREACH

Ziff initially contends that it did not breach the Ad/List Agreement as to PC Brand because Ziff did not repudiate the agreement but merely asserted a litigation position. Ziff argues that it had a constitutional right to defend its position that Gold did not control PC Brand. See *Philip I. Mappa Interests, Ltd. v. Kendle*, 196 Ill. App. 3d 703, 709, 554 N.E.2d 1008 (1990) ("Efforts to seek redress through

the judicial process are protected by the first amendment right to petition the government for redress of grievances").

■ Plaintiffs respond that their claims are not based on Ziff's litigation position but, rather, Ziff's extrajudicial conduct before the motion for preliminary injunction was filed on December 6, 1988. Plaintiffs point to a letter dated November 8, 1988, from Morse to Gold which stated in pertinent part:

> "After reviewing the documents provided by PC Brand's counsel, we have reached the conclusion that PC Brand, Inc. is not eligible to receive the benefits of the Ad/List Agreement since it is not a company controlled by you and that your sale of those benefits was in violation of that agreement.
>
> * * *
>
> Therefore, the ad pages which it has used should have been paid at the regular rate. Although we haven't calculated the exact amount, we estimate that the additional amount owed through the November 29 issue of PC is approximately $350,000. We must, therefore, request that arrangements be made for the payment of the amount within the next thirty days. If we cannot resolve this matter within that period, we will have to consider other appropriate steps."

Although the letter mentions "appropriate steps," there is nothing to indicate that Ziff was asserting a litigation position in this letter.

Ziff further argues that this letter does not constitute a breach because there was no absolute or unqualified refusal to perform. To establish a breach, the "defendant's renunciation of the contract must be an unqualified and positive refusal to perform and must go to the whole of the contract." *Gittlitz v. Lewis*, 28 Misc. 2d 712, 713, 212 N.Y.S.2d 219, 220 (1961). In our view, the letter's terms indicated an unqualified refusal to perform unless payment was made within 30 days.

Even if the letter did not constitute a breach, Gold and Dukker also testified that Ziff breached the Ad/List Agreement by imposing an extracontractual condition at a meeting that took place on December 6, 1988. Gold, Dukker, Morris, and senior vice president of Ziff, Phil Sine, were present at the meeting. Gold and Dukker testified that Sine stated the 20% rate Gold's companies paid was too little and that Ziff wanted double the price, 40% of full rates. At trial, Sine was impeached with his deposition testimony as follows:

> "Q. —[D]oes that refresh your recollection that you told Mr. Dukker or Mr. Gold during the December, '88 meeting that you referred to earlier that the 23 percent figure in the '86 agreement was not a fair amount to Ziff?
>
> A. Yes, that's what it says.

Q. And you express your belief that the 40 percent figure was more fair compensation?

A. Yes, but I wasn't trying to change the deal.

Q. Well—

A. That was just a comment that I made."

Under New York law, insistence upon terms that are not contained in a contract constitutes repudiation. *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976). After reviewing the record in this case, it is our view that a trier of fact could conclude that there was sufficient evidence to establish that Ziff insisted upon terms not within the contract. We conclude that the evidence was sufficient to establish that the breach regarding PC Brand commenced in December 1988.

■ Ziff next argues that no evidence was presented by plaintiffs proving that Gold controlled PC Brand. " 'Whether a contract has been performed according to its terms is a question of fact [citation], and this court will not disturb the trier of fact's determination unless the finding is against the manifest weight of the evidence or the verdict is unsupported by any evidence whatsoever.' " *Barrows v. Maco, Inc.*, 94 Ill. App. 3d 959, 968, 419 N.E.2d 634 (1981), quoting *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 32 Ill. App. 3d 249, 253, 336 N.E.2d 185 (1975).

■ Ziff posits that mere record ownership of the majority of shares did not mean that Gold actually controlled PC Brand. Ziff points to PC Brand's certificate and bylaws, which provided that: only Dukker and Gold would serve on the board; the board could only be changed unanimously; if Gold died, Dukker became sole director; and the certificate and bylaws could not be amended without Dukker's consent. Ziff concluded that Dukker had beneficial ownership of at least 50% of the voting shares through the Board deadlock; 51% in the event of a sale of the business; and total control over the corporate capital through his sole control over director's fees.

In opposition, plaintiffs presented evidence that Gold maintained controlling influence over PC Brand. Friedman, the attorney who prepared PC Brand's incorporation documents, testified that the board was not deadlocked because Dukker, as president, could not vote on management issues or participate in Gold's decision to fire him, due to conflict of interest. Plaintiffs also pointed out that Gold controlled PC Brand's "purse strings" because only Gold had sole power to control the loan by Microvest. Gold also provided the initial seed money, the ad/list rights, the PC Brand name and phone number, and controlled the relationship with Ziff.

Though Ziff argues that the trial court ignored the subjective intent of Dukker and Gold, both testified that PC Brand was formed

with the intention of complying with the ad/list rights agreement. Dukker further testified that he viewed Gold as his boss, to whom he reported. Stan Seitz, who reported to Dukker, testified that he believed Gold was his "boss' boss." On review, we conclude that there was sufficient evidence to support the jury's verdict that Gold controlled PC Brand.

### B. CAUSATION

Ziff also argues that there was no competent evidence that its conduct caused damage to PC Brand and it is entitled to a judgment notwithstanding the verdict on the matter. The standard for a judgment *n.o.v.* is whether all the evidence viewed most favorably to respondent so overwhelmingly favors movant that no contrary verdict based on such evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). In a contract action, plaintiff must demonstrate that defendant's breach caused plaintiff's damages. *Oakleaf v. Oakleaf & Associates, Inc.*, 173 Ill. App. 3d 637, 646, 527 N.E.2d 926 (1988).

In the present case, Ziff points to Dukker's testimony about Hambrecht & Quist refusing to provide financing due to litigation as plaintiffs' only causal evidence. However, plaintiffs alleged the following additional facts: PC Brand incurred costs for non-Ziff advertising at full rates; PC Brand spent additional amounts on Ziff advertising above the agreed 20% discount; PC Brand lost potential investors due to pending litigation concerning ad/list rights; and it incurred legal fees to enforce the Ad/List Agreement. The jury could reasonably conclude that those problems caused PC Brand's cash flow difficulties and resultant damages. Viewed in the light most favorable to plaintiffs, the evidence fails to overwhelmingly favor Ziff. Ziff also argues that PC Brand's losses are not "directly traceable" to Ziff's refusal to allow use of the ad/list benefits. See *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986) (*Kenford I*) (damages must be directly traceable to the breach, not remote or the result of other intervening causes). In support of its view, Ziff cites an Illinois case, *Movitz v. First National Bank*, 148 F.3d 760 (7th Cir. 1998). In *Movitz*, a real estate investor sued a bank for negligence and breach of contract, alleging that the bank's negligent evaluation of a Houston office building before the investor's purchase caused his loss. The building had defective air conditioning ducts, which the bank failed to detect before the purchase. The Houston real estate market also collapsed that year. Tenants vacated the building, the mortgagee foreclosed and almost the entire investment was lost. *Movitz*, 148 F.3d at 761.

The Seventh Circuit Court of Appeals held that while the bank's negligence satisfied the "but for" test of causation, the bank was not legally responsible for the investor's loss because the collapse of the Houston real estate market was not reasonably foreseeable. In the words of the court:

"The Houston commercial real estate market crashed as surely in the early 1980's as the stock market crashed in 1929 or 1987, and no one supposes that the First National Bank of Chicago had undertaken to insure [investor] against such a catastrophe." *Movitz*, 148 F.3d at 764.

Unlike *Movitz*, there is no evidence of a catastrophic market condition that undoubtedly caused PC Brand's losses in the instant case. While Ziff alleges a list of conditions that may or may not have contributed to PC Brand's losses (industry recession, market conditions, low prices, competition, growth, theft of $500,000 and product returns), the jury also heard credible evidence that Ziff's conduct damaged PC Brand, as noted above. Stan Seitz, PC Brand's executive vice president, testified that the money PC Brand spent on non-Ziff advertising alone ($750,000) exceeded the maximum amount of working capital required. One of Ziff's damages experts, Alan Peterson, also testified that it would have made a difference if the money PC Brand spent on non-Ziff advertising, Ziff advertising above the 20% rate, and legal fees associated with the litigation had been available as working capital. The jury could have concluded that Ziff's enumerated actions caused PC Brand to lose sales and profits. The trial court did not err by denying Ziff's motion for judgment *n.o.v.* on the issue of causation.

## IV. PC BRAND: DAMAGES

### A. Lost Profits

Ziff argues that the award for lost profits is based on legally impermissible speculation for several reasons: PC Brand, as a new and unprofitable business, had no track record upon which to base profit projections; Hosfield's damage model was not based upon companies comparable to PC Brand; and Ziff did not assume liability for lost profits.

■ Under New York law, a plaintiff is entitled to recover lost profits only if he can establish with reasonable certainty both the existence and amount of such damages. *Kenford I*, 67 N.Y.2d at 261, 493 N.E.2d at 236, 502 N.Y.S.2d at 132. The damages may not be merely speculative, possible or imaginary (*Kenford I*, 67 N.Y.2d at 261, 493 N.E.2d at 236, 502 N.Y.S.2d at 132), though lost profits need not be proven with mathematical precision (*Ashland Management Co. v.*

*Janien*, 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 1010, 604 N.Y.S.2d 912, 915 (1993)). Guided by these general principles, we turn to Ziff's specific arguments.

### 1. Track Record

■ Ziff argues that PC Brand failed to meet New York law's stricter standard imposed upon a "new business" attempting to recover lost profits. "[E]vidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (*Schonfeld II*)[1] . *Kenford I, Schonfeld II* and *Ashland* are instructive on this issue.

In *Kenford I*, Erie County had contracted with Kenford Company, Inc., and Dome Stadium, Inc. (DSI), to construct and operate a domed stadium. In exchange for the land donation, the county was supposed to begin construction within 12 months of the contract date and, upon completion, the county was to enter into a 20-year management agreement with DSI. When the construction was not timely commenced, DSI sued the county and sought lost profits that it would have received under the management agreement. The court held that DSI could not recover lost profits because their existence could not be proven with reasonable certainty. *Kenford I*, 67 N.Y.2d at 260, 262-63, 493 N.E.2d at 236, 502 N.Y.S.2d at 133.

Similarly, in *Schonfeld II* the court held that lost profits could not be recovered for breach of promise to fund a proposed cable television channel. The channel consisted of untested programming (an "Americanized" version of BBC) with no established customer base. The court found that the channel was a new entertainment venture similar to the proposed stadium in *Kenford I*. The court emphasized that the channel "never saw the light of day" and its profits were purely hypothetical. *Schonfeld II*, 218 F.3d at 173. Though the defendants argued that they were experienced cable channel operators, the court noted that defendants and BBC had never jointly operated a cable channel before and this was an introduction of a new product into a new market. Thus, without an historic record of operations, the court concluded that there was no basis from which lost profits could be projected for this new business. *Schonfeld II*, 218 F.3d at 173.

In contrast, *Ashland* involved a dispute between an investment firm and a former employee who was awarded lost profits for breach of

---

[1]*Schonfeld v. Hilliard*, 62 F. Supp. 2d 1062 (S.D.N.Y. 1999) (*Schonfeld I*), cited by both parties, was recently affirmed in part, reversed in part, vacated and remanded by the Second Circuit Court of Appeals in *Schonfeld II*.

contract. The employee had developed a mathematical model for determining investment strategy and tried to sell it to the firm. When a dispute arose during negotiations, the firm sued to prevent the employee from using his model and the employee counterclaimed for breach of contract. Even though the parties were launching a new investment strategy, the court held that they were not entering a new or unfamiliar business. The new but tested strategy would be introduced by an existing financial management corporation with an extensive customer base. Thus, the projection of future profits was not speculative. *Ashland*, 82 N.Y.2d at 406, 624 N.E.2d at 1012, 604 N.Y.S.2d at 917.

The instant case is more analogous to *Ashland*. Unlike *Kenford I* and *Schonfeld II*, PC Brand was not a new business that had never seen the light of day. Plaintiffs also argue that PC Brand could also draw upon Gold's prior experience with SCI, which conducted mail order sales using the ad/list rights and the name "PC Brand" from 1982 through 1988. However, plaintiffs do not allege whether SCI was a success under Gold's management.

Ziff also argues that PC Brand's history of losses precludes recovery for lost profits. Ziff cites several cases, including *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502 (2d Cir. 1989), and *Schneidman v. Tollman*, 261 A.D.2d 289, 691 N.Y.S.2d 58 (1999). In *Proteus*, the court found that it was difficult to assess a book publisher's future earnings because its sales performance in the United States had been consistently poor. *Proteus*, 873 F.2d at 510. Similarly, the court in *Schneidman* denied limited partners in the motel business the recovery of lost profits because the properties at issue had no history of profits whatsoever. *Schneidman*, 261 A.D.2d at 290, 691 N.Y.S.2d at 59. ("Far from generating profits, the properties operated at a staggering loss, were ultimately foreclosed upon by lenders, and even subsequent to foreclosure left an outstanding indebtedness of millions of dollars").

In the instant case, PC Brand reported increasing net sales as follows: $7,708,453 in 1988, its first year of operation; $28,872,523 in 1989; and $37,559,537 in 1990. Unlike the book publisher in *Proteus*, PC Brand's sales performance was progressively higher each fiscal year. Ziff further contends that PC Brand's net profit was only $150,000 in 1989 and it was insolvent by 1990 with losses of $3.1 million. Unlike the properties in *Schneidman*, however, PC Brand did turn a profit of $150,000 in 1989. A jury could reasonably conclude that the subsequent losses occurred because the full ad/list rights were unavailable starting in December 1988 and PC Brand was only entitled to six discounted advertising pages under the preliminary injunction.

Ziff further argues that, based on these figures, PC Brand could not predict the amount of lost profits with any degree of certainty. However, " '[a] person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain.' " *Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc.*, 183 A.D.2d 1055, 1058, 583 N.Y.S.2d 648, 650 (1992), quoting *Wakeman v. Wheeler*, 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886).

## 2. Comparable Companies

Ziff also argues that PC Brand's calculations were too speculative because Hosfield projected profits by reference to the profits of existing, comparable firms. Ziff relies on *Mehta v. New York City Department of Consumer Affairs*, 162 A.D.2d 236, 237, 556 N.Y.S.2d 601, 602 (1990), *H&P Research, Inc. v. Liza Realty Corp.*, 943 F. Supp. 328 (S.D.N.Y. 1996), and *Lovely Peoples Fashion, Inc. v. Magna Fabrics, Inc.*, No. 95 Civ. 8450 (S.D.N.Y. July 22, 1998).

In *Mehta*, an applicant was denied recovery of lost profits when the department of consumer affairs removed his name from a waiting list to operate a sidewalk newsstand. The court stated:

> "In order to recover lost profits, a business must have been established and in operation for a definite period of time and calculations based on other similar businesses are too speculative and will not satisfy the reasonable means of calculating damages and lost profits." *Mehta*, 162 A.D.2d at 237, 556 N.Y.S.2d at 602.

The court explained that the newsstand in question had not been established and thus the calculation of profits was too speculative. Nothing in the court's opinion indicated that the plaintiff had even presented any calculations based on similar businesses.

The court in *H&P* denied the plaintiff recovery for lost profits because plaintiff relied solely on the speculative basis of projections drawn from other businesses and gave no financial account of its own business whatsoever. *H&P*, 943 F. Supp. at 331 ("plaintiff has given no account of the scope of its business in Illinois or anywhere else prior to its abortive operations in New York, much less any account of profits it may have derived from similar operations"). Similarly, the court in *Lovely* denied plaintiffs profits because the only evidence they presented on this issue was a vague reference to another successful business in a newspaper. *Lovely*, slip op. at 6 ("The only 'evidence' plaintiffs have offered to support their claim for lost future profits is their allusion to a newspaper report about an unnamed women's clothing manufacturer allegedly making 'millions' ").

*Mehta*, *Lovely*, and *H&P* are inapposite because *Mehta* did not even involve the use of comparable companies, while *Lovely* and *H&P*

discounted the use of similar businesses because the parties failed to submit any evidence of actual sales figures from their own businesses. In contrast, here, Hosfield calculated PC Brand's lost profits based upon its own audited financial statements in conjunction with industry data for other companies. Hosfield explained that he used the discounted cash flow method and did not conduct a comparable company analysis. Hosfield used the results of other companies only to determine an industry growth rate and confirm his projections of PC Brand's actual sales.

### 3. Assumption of Liability

■ Ziff further argues that it did not expressly assume liability for lost profits in the agreement, and the award should be reversed. Under New York law, there must be a showing that lost profits were fairly within the contemplation of the parties to the contract at the time it was made. *Kenford I*, 67 N.Y.2d at 261, 493 N.E.2d at 236, 502 N.Y.S.2d at 133. "When the contract is silent on the subject, the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose, and particular circumstances of the contract known by the parties *** as well as what liability the defendant fairly may be supposed to have assumed consciously.' " *Schonfeld II*, 218 F.3d at 167, citing *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176, 179, 540 N.Y.S.2d 1, 4 (1989) (*Kenford II*).

■ Ziff argues that the Ad/List Agreement incorporated the rate card for Ziff's magazines, which expressly excluded liability for the lost profit and business value damages. The agreement refers to the rate card as follows:

> "The price for those pages shall be equal to 23.53% of the *then current rate card* for the frequency contracted for and earned, against which rate you shall be entitled to deduct *** discount[s] offered generally to advertisers." (Emphasis added.)

Upon inspection, the agreement refers to the rate card for the purpose of establishing the price of each discounted advertising page. " '[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.' " *F. Garofalo Electric Co. v. Hartford Fire Insurance Co.*, 799 F. Supp. 8, 11 (E.D.N.Y. 1992), quoting *Guernini Stone Co. v. P.J. Carlin Construction Co.*, 240 U.S. 264, 277, 60 L. Ed. 636, 642, 36 S. Ct. 300, 306 (1915). Thus, we do not believe that the agreement's reference to the rate card incorporates its liability exclusions. Moreover, the fact that Ziff expressly included liability exclusions in its rate card but failed to mention them in the Ad/List Agreement is significant.

Plaintiffs argue that Ziff's liability for lost profits was reasonably contemplated at the time of the contract's execution, both in the original 1982 contract and the amended 1986 agreement. Gold's presale term sheet, which Ziff accepted, stated that Gold "intend[ed] to establish a new business which will depend upon *** continuing access" to the ad/list rights. Morris also testified that he knew Gold wanted to establish a business that depended upon the ad/list rights; that the rights would be "valuable to Tony if he set up the business"; and that the idea behind the rights was to allow Gold to make money by using them.

Ziff responds that this case is like *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326 (2d Cir. 1993). In *Trademark*, plaintiff trademark search service (TRC) contracted with defendant software design firm (BRS) to provide an automated trademark database and search system. When defendant delayed two years in delivering trademark database, plaintiff sued for breach of contract and lost profits. In assessing whether lost profits were reasonably contemplated by the parties, the court noted that the only executed writing governing the parties' agreement was an informal declaration of intent which was silent on the issue of damages. Plaintiff argued that defendant "knew when it undertook the database project that TRC had to automate in order to survive." *Trademark*, 995 F.2d at 334. The court stated:

"However, BRS's awareness that there was a large downside risk to TRC militates against the idea that BRS would have embraced it. *** The record contains no specific evidence that, at the time of contracting, BRS accepted liability for nine years of lost profits. No evidence was offered that the parties ever discussed lost profit liability." *Trademark*, 995 F.2d at 334.

In fact, an earlier contract for a prototype database expressly provided that BRS would not be liable for loss-of-business damages. The court concluded that the informality of the declaration of intent and the parties' prior contracting history confirmed that BRS did not accept liability for lost profits. *Trademark*, 995 F.2d at 334.

Like *Trademark*, plaintiffs present no evidence that the parties ever discussed lost profits liability. Instead, plaintiffs simply point to Ziff's "awareness" that there was a large downside risk for PC Brand if the ad/list benefits were denied. The only contractual provision plaintiff cites permits Gold to use the ad/list rights in a "business which [he] set[s] up which is engaged in mail order sales or similar distribution of products." Again, this provision states the purpose of the contract, but does not provide any further insight as to whether Ziff "was agreeing to underwrite the hypothetical profits from these

plans." *Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 375, 604 N.E.2d 1356, 1362 (1992). Without more, it cannot be said that the parties reasonably contemplated Ziff's liability for lost profits under New York law.

Plaintiffs argue that their damages for lost profits are "general," requiring only that plaintiffs prove that they flowed naturally from the breach. Plaintiff relies on *American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 549 N.E.2d 1161 (1989). In *American List*, a listing company sued defendant publisher for publisher's alleged breach of agreement to purchase its mailing lists. The agreement explicitly contained a schedule of the estimated number of names to be provided and the fees to be paid by defendant. Significantly, appended to the agreement was also a schedule of estimated losses and profits of plaintiff in each of the 10 years contemplated by the agreement. A year later, defendant canceled the contract and plaintiff sued to recover lost profits.

The court characterized the lost profits as "general" damages and explained:

> "General damages are those which are the natural and probable consequence of the breach, [citation], while special damages are extraordinary in that they do not so directly flow from the breach. These extraordinary damages are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made." *American List*, 75 N.Y.2d at 42-43, 549 N.E.2d at 1164, citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (failure to prove foreseeability of claimed damages of lost profits of mill operation resulting from common carrier's breach of contract to timely deliver broken mill shaft for repair).

The court emphasized that defendant assumed a definite obligation to pay lost profits by the express terms of the agreement. In fact, a sum of $3,027,500 was explicitly set forth in the contract schedule as contemplated profits. The court concluded that the moneys plaintiff sought were general damages flowing as a natural and probable consequence of the breach. *American List*, 75 N.Y.2d at 43-44, 549 N.E.2d at 1164.

Unlike *American List*, Ziff did not assume a definite obligation for plaintiffs' lost profits by the express terms of the agreement. Since the agreement itself is silent on the subject of damages, we cannot agree that the moneys plaintiffs seek to recover can be characterized as "general" damages. Thus, the award for lost profits is reversed.

### B. Business Value

Ziff also argues that PC Brand's business value damages are legally

inappropriate for several reasons. First, Ziff argues that Hosfield inappropriately valued PC Brand on December 31, 1992, though there was no alleged breach on this date. We agree.

■ "It is a fundamental proposition of contract law, including the law of New York, that the loss caused by a breach is determined as of the time of the breach." *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 825 (2d Cir. 1990). In the instant case, we have already determined that Ziff breached the agreement as to PC Brand in December 1988. However, Hosfield used the discounted cash flow approach to calculate the fair market value of PC Brand as of December 31, 1992. Plaintiffs offer no explanation why Hosfield used December 1992 rather than December 1988, except to say that Ziff was not prejudiced by this result. In our view, the business value of PC Brand should have been assessed at the time of the breach.

■ Next, Ziff argues that the market value for PC Brand should relate to the final sale of PC Brand to Tandon Corporation in June, 1991. "Fair market value is \*\*\* best set by the market itself. An actual price, agreed to by a willing buyer and a *willing* seller, is the most accurate gauge of the value the market places on a good." (Emphasis added.) *Keener v. Exxon Co., USA*, 32 F.3d 127, 132 (4th Cir. 1994). See also C. McCormick, Handbook on the Law of Damages 165 (1935) ("The standard of value normally used in assessing damages is the market value; that is, what the property could probably have been sold for in the ordinary course of voluntary sale by a leisurely seller to a willing buyer").

■ In the instant case, it was reasonable for the jury to conclude that Gold and Dukker were not "leisurely sellers" based on Hosfield's testimony:

"Q. When you looked at it, what did you do with the information that you learned about the Tandon transaction?

A. The Tandon transaction was one in which a company was sold, but the company—if you look at the revenue ruling that was up when Mr. Den Uyl was testifying, it has to be a willing buyer and a willing seller. The transaction has to take place where neither buyer nor seller is under any compulsion to make the transaction.

This is a company that was under duress. They sold the company to avoid bankruptcy in order to protect the customers, the employees and the creditors of the company and make sure that they got paid and had jobs.

This clearly is not the transaction, and the time it took place and the financial condition of PC Brand for the preceding six months would not make that an indicator of the value of PC Brand. My assignment was to value PC Brand when it was operating without

the Ad/List rights being challenged under litigation. The Ad/List rights had been challenged throughout most of the existence of the company."

Thus, there was sufficient evidence for the jury to conclude that the sale to Tandon was not a reliable indicator of the value of PC Brand.

■ Finally, Ziff contends that Hosfield's valuation model was based on several false assumptions (there was no litigation after January 1, 1991; Dukker would have managed the company until 1995; Ziff did not make the full 80% ad discount available after March 1991; litigation made it impossible to obtain financing; and PC Brand's sales would have increased yearly in relation to companies that were not comparable). Hosfield used the discounted cash flow approach, a common method of business valuation, to calculate the fair market value of PC Brand as of December 31, 1992. *Superior Investment & Development Corp. v. Devine*, 244 Ill. App. 3d 759, 768-69, 614 N.E.2d 302 (1993) (approving use of discounted cash flow analysis). This method values a business based upon projections of future cash flows, which are discounted based upon the time value of money and the relative risk of the investment. We note that Ziff does not attack Hosfield's chosen method, but rather his assumptions. The court in *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995), faced a similar situation when defendant attacked various aspects of the testimony of plaintiff's expert concerning business value. The court observed:

"To the extent he departed from general valuation practices or adopted procedures subject to criticism, defendant had ample opportunity to elicit these facts and argue them to the jury. The expert's training and background and the procedures he followed in arriving at a valuation presented the jury with the question of whether or not to accept the expert's opinion and what weight to give it." *Indu Craft*, 47 F.3d at 496.

Here, both plaintiffs and Ziff called Mr. Hosfield in their cases in chief. Ziff also called several witnesses, including Mr. Alan Peterson and Mr. Robert Den Uyl, to criticize Hosfield's valuation technique. Like *Indu Craft*, in the instant case, the question of whether to accept Hosfield's opinion and the weight to be attached to his testimony are matters which should properly be reposed with the jury. *Indu Craft*, 47 F.3d at 496.

In sum, on the issue of damages, we believe that a new trial limited to the question of damages is necessary to subtract recovery for lost profits and recompute business value damages for breach, commencing in December 1988. See *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 319-20, 515 N.E.2d 61 (1987) (approving a new trial limited to the issue of damages where there was sufficient evidence to find defendant liable and defendant was not prejudiced).

# V. HANSON: BREACH AND DAMAGES

## A. Breach

■ Ziff also argues that it did not breach the Ad/List Agreement as to Hanson. We disagree. *Indu Craft* is instructive. In *Indu Craft*, plaintiff garment company borrowed money from defendant bank and relied upon the bank for letters of credit. The letters were necessary for plaintiff's business. On numerous occasions plaintiff was permitted to exceed its line of credit overdraft limit, sometimes by as much as 40%. The bank also granted letters of credit quickly, typically within 24 hours of application. When plaintiff's owner declined to invest in venture for the benefit of the bank officer's son, however, the relationship deteriorated. The bank demanded that plaintiff reduce its $1.3 million overdraft to its preset limit of $1.2 million. Letters of credit were substantially delayed, if issued at all. The bank also demanded that applications for such letters be backed by confirmed orders from 100% of Indu Craft's customers. That requirement had never before been imposed. *Indu Craft*, 47 F.3d at 493. The court of appeals affirmed the jury's decision that the bank breached the covenant of good faith and fair dealing implied in the loan documents. *Indu Craft*, 47 F.3d at 493-94.

Like the bank in *Indu Craft* which suddenly demanded that letters of credit should be backed by confirmed orders, Ziff imposed new requirements that Hanson furnish assurances of its financial condition before Ziff allowed use of its subscriber list. On May 22, 1989, Morris stated he would not release subscriber lists unless Hanson provided proof that it had "the working capital and inventory of goods to fill orders from the catalog mailing." Ziff argues that its request for assurances were reasonable in case Hanson was unable to fill orders and thereby harm Ziff's reputation. Howard Gosman, president of Hanson, testified that Ziff's demand would require Hanson to purchase inventory for the life of the catalog, up to one year or more, without knowing the exact demand for individual products. Gosman stated that Hanson normally maintained a 30-day supply of inventory and could obtain additional products within 24 hours. Further, Hanson customers were not billed until merchandise was shipped—a policy Hanson had communicated to Ziff. We believe there was sufficient evidence for the jury to conclude that Ziff's demand for assurances was unreasonable and breached the Ad/List Agreement.

Plaintiffs also allege that Ziff unreasonably delayed in providing the subscriber list in November 1988 for Hanson's holiday catalog. Howard Gosman testified that not only did Ziff provide the list late, it initially only provided a partial list. Gosman stated that a full list was

not received until three weeks after the target date, delaying the catalog and causing loss of peak sales. Again, we hold that there was sufficient evidence to find that Ziff breached the agreement when it delayed in providing the full list for Hanson's holiday catalog. In our view, the evidence was sufficient to establish that the breach regarding Hanson commenced in October 1988.

However, we agree with Ziff's contention that it did not breach the agreement when it refused to allow Hanson to run third party ads. Although Ziff may have allowed SCI to run similar ads in the past, paragraph 4(ii) of the Ad/List Agreement expressly prohibits Gold from promoting products or services of "businesses which were already advertisers in any PC Publication prior to [Gold] obtaining control."

Plaintiffs also cite several extracontractual conditions imposed by Ziff before Hanson was permitted to use the subscriber list for its first catalog mailing. However, there was no evidence that some of the conditions were actually enforced (Hanson could not mail to more than 50% of the names on Ziff's list at a time; Hanson must mail to non-Ziff lists when it mailed to Ziff's lists). Furthermore, nothing in the record indicates that the other conditions (catalogs limited to four per year; no editorials to be printed in catalogs; catalogs must be created in-house; and the source of Ziff's list was to remain anonymous) actually caused damage to Hanson. See *Oakleaf*, 173 Ill. App. 3d at 646 (plaintiff must demonstrate that defendant's breach caused plaintiff's damages).

## B. Damages

For the same reasons noted for PC Brand, we reverse Hanson's lost profit award because such damages were not within the reasonable contemplation of the parties. We also remand for a new trial limited to the issue of business value damages to be recomputed as of the date of breach, commencing in October 1988.

## VI. PREJUDGMENT INTEREST

Ziff also argues that the trial court erred by awarding plaintiffs prejudgment interest. First, Ziff argues that in order for plaintiffs to be entitled to prejudgment interest, New York law requires that the amount due must be reasonably ascertainable at the time of the alleged loss. In Ziff's view, since the damage amount only became ascertainable when the jury fixed its value in its verdict on July 6, 1999, the plaintiffs are not entitled to prejudgment interest.

The New York interest statute sets forth in pertinent part:

"(a) Actions in which recoverable. Interest shall be recovered upon sum awarded because of a breach of performance of a contract

*** except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed ***." N.Y. C.P.L.R. § 5001 (West 1999).

Section 5001(a) states that a party "shall" recover interest for damages due to breach of contract. However, nothing in the statute indicates that damages must be reasonably ascertainable at the time of loss. Instead, section 5001(b) merely focuses on the earliest ascertainable *date* the cause of action existed.

Ziff relies on older New York decisions which denied the award of interest because damages were not reasonably ascertainable before trial. See *Faber v. City of New York*, 222 N.Y. 255, 262, 118 N.E. 609, 611 (1918) (court denies prejudgment interest because value of rock excavation had no established market value as of a fixed day from which interest could be calculated); *Gray v. Central R.R. Co.*, 157 N.Y. 483, 487-88, 52 N.E. 555, 556-57 (1899) (plaintiff could not recover interest on its damages for nonacceptance of a steamboat at a contract price because the vessel had no well-defined market value); *Grobe v. Kramer*, 178 Misc. 247, 33 N.Y.S.2d 901 (1942) (plaintiff not entitled to interest on damages for fraudulent deprivation of stocks because the value of the stock on the day of the commission of fraud was not fixed and capable of computation).

However, more recent New York cases cited by defendant dispense with the requirement that the amount due must be ascertainable before interest can be awarded. In *Galloping, Inc. v. QVC, Inc.*, 27 F. Supp. 2d 466 (S.D.N.Y. 1998), licensor sued defendant for breach of licensing agreement and was awarded damages for amounts attributable to advance royalties, including lost profits. Defendant argued that licensor was not entitled to prejudgment interest on lost profits because the "amount was not 'readily ascertainable' at a fixed date prior to entry of judgment." *Galloping*, 27 F. Supp. at 468-69. The court rejected defendant's argument and noted that New York law granted prejudgment interest on awards of lost profits even though the damages were not ascertainable until the court fixed the amount. See also *Brushton-Moira Central School District v. Fred H. Thomas Associates, P.C.*, 91 N.Y.2d 256, 692 N.E.2d 551, 669 N.Y.S.2d 520 (1998) (school district was entitled to prejudgment interest in breach of contract action against architect for defective wall panels, though cost to repair or replace panels was to be determined at trial); *S. Leo Harmonay, Inc. v. Binks Manufacturing Co.*, 597 F. Supp. 1014, 1029-30, 1036 (S.D.N.Y. 1984) (court granted prejudgment interest on damages

for labor inefficiency, even though these damages, "uncertain in amount," were not ascertained until the court made its posttrial findings of fact and conclusions of law).

■ Like the defendant in *Galloping*, Ziff argues against awarding interest because the amount due was not ascertainable at a fixed date prior to entry of judgment. Following the modern trend in New York law, we reject Ziff's contention that New York law requires the amount due to be ascertainable before trial. Also, Ziff's other cited case, *Lesjac Realty Corp. v. Mulhauser*, 43 Misc. 2d 439, 251 N.Y.S.2d 62 (1964), is inapposite because it involved recovery on the basis of quantum merit, not breach of contract. Unlike equitable actions like the one in *Jesjac*, breach of contract claims entitle the prevailing party to prejudgment interest as a matter of right. *U.S. Naval Institute v. Charter Communications, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991).

■ Ziff also argues that the interest award should be reversed because it is contrary to Illinois public policy. In support, Ziff cites *Alguire v. Walker*, 154 Ill. App. 3d 438, 506 N.E.2d 1334 (1987). In *Alguire*, the court stated the general rule under Illinois law that "there is no right to recover prejudgment interest unless it is permitted by statute or there is an agreement between the parties." *Alguire*, 154 Ill. App. 3d at 447. The court further explained that Illinois only allowed prejudgment interest if damages were liquidated or subject to exact computation. Here, the interest award does not contradict Illinois' general rule because New York law expressly permits plaintiffs to recover prejudgment interest for breach of contract. Thus, plaintiffs' award of interest was "permitted by statute" and does not contravene Illinois public policy.

Since we remand the case for calculations of business value damages, we do not reach Ziff's contention that the jury's verdict may have included amounts for lost value of money.

## VII. ERRORS AT TRIAL

### Jury Instructions

■ Ziff argues that the jury was not properly instructed on eight issues. Jury instructions must be sufficiently clear to avoid misleading the jury and must fairly and correctly state the law. *O'Neil v. Continental Bank, N.A.*, 278 Ill. App. 3d 327, 341, 662 N.E.2d 489 (1996). A trial court's rulings on instructions will not be reversed absent a clear abuse of discretion. *O'Neil*, 278 Ill. App. 3d at 341. Ziff alleges that instruction numbers 18 and 16 were improper. The other six issues are matters which, in Ziff's view, the court erred by failing to provide instructions. We disagree.

■ First, Ziff argues that instruction number 18, defining control,

simply provided a "laundry list of factors" without following this court's 1994 opinion in *Gold II*. The instructions stated:

> "In determining whether Mr. Gold controlled PC Brand, Inc., you should consider his *stock ownership*, whether Mr. Gold exercised a *controlling influence* over PC Brand, Inc., the *corporate records* of PC Brand, Inc., and the *subjective intent* of Mr. Gold and Mr. Dukker when they created PC Brand, Inc. and entered the interrelated corporate documents." (Emphasis added.)

This court's 1994 opinion provided the following guidelines:

> "[W]e cannot adopt plaintiffs' conclusion that mere *record ownership* was all that was required ***.
>
> *** We do not believe *** that the language defining control as owning at least 51% of the voting stock was intended to limit subsequent inquiry to a cursory examination of the *corporate records*. *** [W]e believe that the parties specifically chose that language because owning a majority of the voting stock is commonly understood as providing a *controlling influence* over the company. [Citation.]
>
> * * *
>
> *** [T]he record is replete with factual questions, the most important of which is the *subjective intent* of Gold and Dukker when they created PC Brand and entered into the interrelated agreements." (Emphasis added.) *Gold II*, 265 Ill. App. 3d at 963-65.

In our view, the jury instructions closely paralleled the guidelines given in *Gold II*.

■ Next, Ziff argues that it was clear error to allow instruction number 16 which stated, "every party to a contract has a duty of good faith and fair dealing as a matter of law" because it implied that Ziff acted in bad faith. However, other instructions contained allegations by Ziff that the plaintiffs failed to perform their obligations under the contract. A reasonable juror could conclude that this instruction applied to both parties.

## VIII. Plaintiff's Cross-Appeal

### A. Escrow Funds

■ The plaintiffs' money that was held in escrow should be returned to them. The trial court's original order, dated December 13, 1988, creating the escrow stated:

> "[D]efendant shall have a lien on any amounts payable to Gold *** and such amounts shall be held by PC Brand, Inc. in an escrow account for the benefit of defendant *pending final trial court determination* of whether PC Brand, Inc. is a company which Gold controls pursuant to the Amended Agreement." (Emphasis added.)

Pursuant to this order, PC Brand deposited $100,000 in an interest-bearing escrow account with the clerk of the court. In March 1991, the

64

trial court granted summary judgment to Ziff on the control issue. In a subsequent order dated July 8, 1993, the trial court then ordered the monies held in escrow to be released to Ziff. Since we affirm the jury's verdict concerning the control issue, we order Ziff to return the moneys held in escrow that were released to Ziff pursuant to the trial court's July 8, 1993, order.

## B. Premium Position

Since we hold that Ziff breached the Ad/List Agreement as to both PC Brand and Hanson, we do not reach plaintiff's contention that Ziff violated the implied covenant of good faith and fair dealing concerning page positioning.

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part, and the cause remanded to the trial court for a new trial limited to damages.

Affirmed in part and reversed in part; remanded with directions.

CAHILL, P.J. and GORDON, J., concur.